# THE MERCHANTS MUTUAL INSURANCE COMPANY, *vs.* GREENBURY B. WILSON.

In an action upon a policy of insurance upon a cargo of two thousand, three hundred bags of coffee, the proof was, that seventy-four bags were sent to Philadelphia in a damaged condition and there sold, and of the residue sent to Baltimore, fifteen hundred and ninety-three bags were found damaged and were there sold, and the accounts of both these sales were given in evidence. While the cargo was discharging in Baltimore, an agent was appointed by the plaintiff to select out the sound coffee, and in discharge of this duty, said agent took out as undamaged five hundred and ninety-six bags, which were taken to the plaintiff's warehouse. After this selection and while the coffee was being weighed, the surveyors tried said five hundred and ninety-six bags with the tryer and told said agent that he was mistaken, that it was all *more or less* injured; that the agent then tried it and found it all *more or less* musty, that he had been misled by the appearance of the bags which were dry, that dampness in any way will injure coffee and render it musty, and that an injury of this sort may result from being in contact with other bags of coffee which are damp. One of the surveyors also proved, that the five hundred and ninety-six bags so selected "were all *more or less* damaged." It was also proved, that if this coffee

28      v.2

had been sound it would have been worth $7.53 per hundred, if sold at six months credit.  HELD :

That this testimony was so indefinite and unsatisfactory, as to furnish no legitimate *data* upon which to estimate the *quantum* of loss to the five hundred and ninety-six bags, and that it was error to grant an instruction authorising the jury to allow such an amount of damages, as they should find from this evidence to be equivalent to the plaintiff's loss thereon.

This testimony does not show that the five hundred and ninety-six bags were damaged more or less than the residue of the cargo, but simply that it was more or less damaged, without giving any *data* with which to compare the more or less; it leaves to the jury nothing to guide them but speculation and conjecture.

This coffee was selected by the plaintiff as sound and taken to his warehouse, and no claim made by him on account thereof until the trial of the cause, when such a time had elapsed as to warrant the presumption of a sale, and when it had been so disposed of by the plaintiff, as to deny the insurers any opportunity of having it examined.  HELD :

That this conduct of the plaintiff, fully justified the insurers in believing that they were not to be charged with any loss on account thereof, and that under such circumstances the proof of loss and the extent of it ought to be clear and satisfactory.

In estimating losses it is the general practice, both in England and the United States, to add the premiums to the invoice value, but this is but a commercial usage of long standing, which may be controlled, changed or modified by a different custom, well sustained by proof, a knowledge of which is brought home to the party, either by positive and direct proof or constructively by circumstances.

The rule of allowing three days grace and requiring demand of payment on the third, is not so inflexible as to admit of no innovations; it may be altered and controlled by agreement of parties or by usage and custom.

A usage of universal prevalence becomes a part of the existing law, and is to be noticed *ex officio* by courts of justice; but a particular usage must be supported by proof, and where well established it is as obligatory as the general law.

Where a particular usage is presumed to be in the knowledge of the party, it enters into the contract and becomes part of it, and must be regarded in the interpretation of it.

The proposition that a usage must be general in order to bind the parties, applies exclusively to cases where the knowledge of the parties and their intention to adopt the usage are inferred merely from the fact of its existence, but when their knowledge or intentions are established by other direct or circumstantial proof, their contract will be governed by the usage, however local or partial, in reference to which it is proved or presumed to have been made.

The terms of an insurance policy may be explained as well by other com-

mercial usages as by the usage of trade applicable only to the course of the voyage.

Four witnesses, one of whom had been a notary public of the city of Baltimore for more than forty years, and accustomed to make out statement of losses on insurance policies, and the others either secretaries or presidents of insurance companies in said city, united in proving it to be the usage in said city not to add the premium note to the invoice value in estimating losses on marine insurance policies. The plaintiff was a merchant of long standing in the city of Baltimore, and received from the said notary a statement of his losses based upon this rule, and presented his claim for damages, assuming that statement to be correct. HELD :

That this was evidence proper for the consideration of the jury, both in regard to the existence of the usage and as to the knowledge thereof by the plaintiff, and if they believed it sufficient to establish the existence of such usage, they were bound by it.

By the policy in this case the insurers were not to pay for any partial loss on the coffee, unless it amounted to seven and-a-half per cent. or more on the sum insured, and it appearing from the statement of losses that the plaintiff could not recover, unless he could claim more than nominal damages on the five hundred and ninety-six bags, or have the premium notes added to the invoice value, and the evidence relating to the five hundred and ninety-six bags being too indefinite to warrant the jury in giving more than nominal damages, and there being proof respecting the usage in question proper for the consideration of the jury, an instruction, that if the jury believe the existence of such usage, then the plaintiff is not entitled to recover, ought to have been granted.

The facts that the plaintiff knew the condition of the coffee, and took to his own store the five hundred and ninety-six bags and disposed of the same without notice to the insurers, cannot of themselves shut out all claim for any damage sustained by said coffee.

There being proof that there was some damage to the five hundred and ninety-six bags, although not sufficient to ascertain the amount, under these circumstances the jury might allow nominal damages.

The fact that there was proof of some damages, no matter how indefinite, cannot have the effect to cast the *onus* upon the insurers to show that it was less than seven and-a-half per cent.

The insurers, by the express terms of the policy, are not liable for any partial loss on the coffee, unless it amount to seven and-a-half per cent. or upwards, and it is incumbent on the plaintiff to bring his claim, by proof, within the provisions of the contract.

A defendant is not bound to produce evidence in defence until his liability is first made to appear, either by proof or by the state of the pleadings.

The policy in this case was for $9000, other insurances having been effected on the same cargo. HELD, that the plaintiff can recover on this policy only that proportion of the general average loss sustained which $9000

Merchants Mutual Ins. Co., *vs.* Wilson.

bears to the value of the whole cargo, and the premium note, with interest from the time it be due, is to be credited as an offset to this proportionate sum.

In ascertaining the amount of partial loss for which the insurers are liable under this policy, the jury must take such proportion of the whole loss sustained by the cargo covered by the policy, as $9000, the sum named in the policy, bears to the original value of the whole cargo, and the plaintiff cannot recover anything for partial loss, unless such proportion so found shall amount to seven and-a-half per cent. on the $9000.

APPEAL from Baltimore county court.

This was an action of *assumpsit* brought, at the January term 1848, of Baltimore county court, by the appellee, against the appellant, upon a policy of insurance for the sum of $9000, upon the cargo of the barque Commerce, from Baltimore to Rio de Janeiro and back. The plea was *non assumpsit.*

*Exception.* At the trial, the plaintiff offered in evidence the policy upon which the suit was brought. This policy bears date the 16th of September 1846, and the conditions of it are sufficiently stated in the opinion of this court, delivered by his honor, Judge ECCLESTON. The plaintiff then offered the invoice of the cargo shipped on board the Commerce at Rio de Janeiro, consisting of two thousand, three hundred bags of coffee, and proved that said vessel left said port, on her return voyage to Baltimore, on the 15th of January 1847, and that owing to disasters incurred from bad weather, she was obliged to put into Barbadoes, where she arrived on the 1st of March 1847, and where, after protest and survey, the cargo was discharged, and the vessel condemned and sold. That of the cargo so discharged, forty-five bags were sold at Barbadoes to pay expenses there incurred, two thousand, one hundred and eighty were shipped to Baltimore by the ship Bermuda, and seventy-four to Philadelphia, by the brig Wm. J. Watson. That an examination of these seventy-four bags was made upon their arrival at Philadelphia, when it was found that they had sustained an average damage of fifteen per cent., occasioned while on board the Commerce. That they were then sold at public auction, and the account of

such sale was offered in evidence, showing $689.74 as the nett proceeds of said seventy-four bags.

He then proved, that the Bermuda arrived in Baltimore, on the 13th of April 1847, and discharged her cargo between the 16th and 21st of the same month. That upon the discharge of said cargo the same was examined by two witnesses, Thos. R. Pearson and W. R. Jackson, who, on the 24th of April, 1847, made out their certificate, in which they certify, that they found one thousand, five hundred and ninety-three bags of said coffee more or less damaged by sea-water, twenty-three of which being more damaged than the rest they recommended to be sold forthwith; and they further certified, that had said coffee arrived at Baltimore in a sound state it would have been worth, at six months' credit, an average of $7.53 per hundred pounds. He further proved by Joseph Withers, that he was employed by the plaintiff to select from the cargo of the Bermuda such parts of the coffee as witness should believe not to be damaged. That witness found that a large part of said coffee was damaged, and that he picked out five hundred and ninety-six bags which he believed to be undamaged, and weighed the same. This witness further proved, that said five hundred and ninety-six bags were sent to the warehouse of the plaintiff, and that the residue of the said coffee so brought by the Bermuda, was sent to the auction room of R. Lemmon and Co., by whom the same was sold at auction. The account of these sales was exhibited, showing the sum of $16,206.01, nett proceeds of one thousand, five hundred and ninety-three bags. It was also proved by Jackson, one of the said surveyors, that this sale by Lemmon and Co., was a very good sale. Said Jackson also states, that he recollects that a portion of the coffee brought by Bermuda, was taken to the warehouse of the plaintiff and there stored, but that he has a very indistinct recollection about it, and cannot say whether the same was damaged or not.

The plaintiff further proved by the witness Withers, that whilst witness was engaged in weighing said five hundred and fifty-nine bags, the said Jackson and Pearson, the survey-

ors, tried said bags with the tryer, and told witness that he was mistaken, that it was all more or less injured; that witness then tried it and found it all more or less musty, that he had been misled by the appearance of the bags. That said bags were dry, but that coffee may be injured by being in contact with anything damp, as by being in contact with other bags of coffee that are damp. That dampness, in any way, will injure coffee and render it musty. This witness also, upon cross-examination, stated, that the plaintiff was present some part of every day while witness was selecting and weighing said five hundred and ninety-six bags, but was not present all the time, or long at a time. The plaintiff also further proved by Thomas R. Pearson, that he was employed by the plaintiff as one of the surveyors aforesaid, and that to the best of his recollection, the five hundred and ninety-six bags selected by witness and sent to the plaintiff's warehouse were all more or less damaged; and that if said five hundred and ninety-six bags had been sound on their arrival in Baltimore, they would have been worth $5.73 per 100 pounds, if sold at six months credit.

The defendant then proved by John Gill, that plaintiff placed in witnesses hands the policy of insurance, bills of lading, surveys, acccount of sales, and other papers necessary for the purpose of making statements of the plaintiff's loss and damage on said cargo of coffee; and that witness accordingly made out for plaintiff statements A and B, and delivered them to him.

These statements, in substance, show, that the insurable interest on the whole two thousand three hundred bags shipped, was $21,935.30. That of these one thousand six hundred and fifty-nine bags were damaged, the proportionable insurable interest in which was $15,822.02. That if these one thousand, six hundred and fifty-nine bags had arrived in a sound state they would have sold for $19,737.78, but in their damaged condition actually sold for only $17,471.28, showing a difference of $2,266.50, thus making the loss $11.48 on one hundred dollars, which would make the

plaintiff's claim $1,816.85, being more than seven and one-half per cent. on the amount insured as provided for by the policy. In these statements the premium note amounting to $247.50 was not included. The witness, Gill, further proved, that he has been a notary public in the city of Baltimore for forty years and upwards, and accustomed to make out statements of losses under policies of insurance, and is familiar with the usages in respect thereof. That statements A and B are correct, and truly stated according to the usages in the said city, except that by inadvertence he omitted to deduct three per cent. from $19,737.78, the value which the one thousand, six hundred and fifty-nine bags of damaged coffee would have sold for if sound; witness having overlooked the fact, that the valuation in the survey was based upon the supposition of a sale at six months' credit instead of cash. That witness corrected this error in statement C, which shows the plaintiff's claim to amount to $1,383.70, which is less than the average of seven and one-half per cent. under the policy.

The defendants also gave in evidence the following offer for insurance made by the plaintiff in this case.

"Insurance is wanted by G. B. Wilson and Co., against all risks whatever on cargo on board barque Commerce, Joshua F. Oram, Master, valued at $18,000, from Baltimore to Rio de Janeiro, and on the proceeds home, by vessel or vessels, valued at $18,000. Please name your premium. Baltimore, 15th September 1846." On this the defendants wrote: "Two and one-half per cent out and home on $9000." and on the face of this offer was also written: "Accepted, G. B. Wilson and Co." The defendant then proved that the plaintiff had effected other insurances on the same coffee, viz: A policy by the Mutual and Marine Insurance Company of Baltimore, dated 15th of September 1846, for $2000; a policy by the Mutual Safety Insurance Company of New York, dated 15th of September 1846, for $5000; another by the same company, dated 3rd of February 1847, for $5000, and another by the Mercantile Mutual Insurance Company of New York, dated 6th of February 1847, for $5000. The defendant

further proved, by George B. Coale, that he is secretary of defendants; that in June 1847, the plaintiff presented statements A and B to defendants, who paid him the sum of $1056.92, and took up from bank and delivered to him the premium note for said policy, these two amounts being the sum due the plaintiff according to said statements, and received from the plaintiff the following receipt: "Baltimore, June 17th 1847. Received of the Merchants' Mutual Insurance Company, $1305.42, in full, for loss and damage to cargo of barque Commerce, insured in policies No. 69." That these payments were made under a belief that statements A and B were correct. That in a day or two afterwards an officer of one of the other companies on said risk, informed the president of defendants, that he had detected an error of the omission to deduct the three per cent. to reduce the valuation to cash, and that afterwards, in consequence of an interview between the president of defendants and plaintiff, the latter on the 19th of June 1847, returned to defendants the sum of $1056.92, but retained the premium note.

The defendant also proved by Baldwin, a secretary of the Mutual Safety Insurance Company of New York, which has an agency in Baltimore; that statement C was a correct statement of the loss according to the usage in the city of Baltimore, of stating marine insurance losses, although said statement did not include the premium note. Edmund Didier, president of the Mutual Fire and Marine Insurance Company of Baltimore proved the same usage. Capt. Graham, president of the defendants, proved, that in June 1847, plaintiff presented statements A and B to defendants, who seeing them to have been made by John Gill, a very experienced person, did not examine them particularly, but believing them correct, and it appearing by them that the amount of the loss was sufficient to make an average of seven and one-half per cent., and consequently, to render the defendants liable for their proportion of it, they paid plaintiff, as stated by the witness Coale, and delivered up to him the premium note. That being informed of the error in the statements, witness called

upon the plaintiff, informed him of it, and the latter repaid the $1056.92, but retained the premium note, which he still holds. That witness has been accustomed to adjust losses with insurance companies in Baltimore, on policies in which he was interested as the insured, and also as president of the defendants, and knows the usage of the city of Baltimore is not to add the premium note to the invoice value in adjusting losses. Samuel Thompson, the president of the Atlantic Mutual Insurance Company of Baltimore, is familiar with the usages of insurance companies in said city, and the mode of stating and adjusting marine losses in said city, since and before 1837, and that it is the usage of said companies, in stating such losses, not to take any notice of the premium or premium note; and on cross-examination witness stated, that he never saw the premium included in any calculation or statement of loss made or settled by any marine insurance company in the city of Baltimore, unless the order for insurance stipulated for it expressly, in which case it is included, but otherwise not, and on being shown the order for insurance in this case he finds there is no such stipulation or provision.

The evidence of the plaintiff further showed a correspondence between Mr. Marshall, the plaintiff's attorney, and the president of the defendant, in relation to this claim, the purport of which is stated in the opinion below.

The plaintiff then submitted three prayers, the first of which will be found at length in the opinion of this court.

2nd. If the jury shall find from the evidence, that plaintiff sustained an actual loss on the coffee in bags, by any of the perils insured against, to an amount exceeding seven and one-half per cent. on $9000, then he is entitled to recover such proportion of said loss as $9000 may bear to the whole amount at risk, even if said proportionate sum shall be less than $675.

3rd. If they shall find from the evidence, that defendant's offer for insurance was accepted as an offer for insurance of the plaintiff's cargo, valued at $18,000, with this modification only, that defendants would take a risk thereon, only to the extent of $9000, then plaintiff is entitled to recover in respect

to any partial loss on coffee in bags, if they shall find from the evidence, any such partial loss, such sum as may bear the same proportion to the plaintiff's said partial loss, as $9000 bears to $18,000.

The defendant then offered seven prayers, the first and third of which are fully set out in the opinion below.

2nd. If the jury shall find the facts stated in the foregoing prayer, and shall further find, that after said survey of said coffee at Baltimore, the plaintiff, with a knowledge of the condition of said coffee, took to his own store five hundred and ninety-six bags thereof, and disposed of the same without notice to the defendants, then the plaintiff is not entitled to recover in this action for any damage sustained by said coffee.

4th. That assuming the statement B to be a true and correct statement of the general average loss sustained by the plaintiff, in the voyage covered by the policy in this case, said plaintiff is entitled to recover against these defendants no more than their proportion of said loss, which $9000 will bear to $21,935.30; and that as an offset to said proportionate sum, the defendants are entitled to be credited with the amount of the premium note surrendered to the plaintiff, with interest thereon from the day it fell due.

5th. That in ascertaining the amount of partial loss in this suit, for which the defendant is liable under the policy, the jury must take such proportion of the whole loss proved to have been sustained by the cargo covered by the policy, as $9000, the sum named in the policy, bears to the original value of the whole of said cargo. And also, that the plaintiff cannot recover anything for partial loss, unless such proportion so found, as above stated, shall amount to seven and one-half per cent. on the $9000.

6th. That if they believe the evidence offered by the defendants, in regard to the usage of insurers in the city of Baltimore, in stating and settling partial losses, in cases of goods damaged, covered by insurance, that then the premiums of insurance paid by the plaintiff upon the several policies offered in evidence in this cause, ought not to be taken into account

in the ascertainment of the partial loss alleged by the plaintiff to have been sustained by him in this case.

7th. That upon the evidence offered in this case, the jury cannot allow damages for the injury done to the five hundred and ninty-six bags of coffee, taken by the plaintiffs to the store of the plaintiffs, if any such damage shall be found by them to have been so done, other than such as are merely nominal.

The court, (Frick, C. J., and Le Grand, A. J.,) granted the first prayer of the plaintiff and rejected his second and third. They also granted the fourth, fifth and sixth prayers of defendants, and rejected their first, second, third and seventh. The defendants excepted to the granting of the plaintiff's first prayer, and to the refusal to grant their rejected prayers.

The jury rendered a verdict for the plaintiff, and assessed the damages at $2166.59. Whereupon the defendants moved for a new trial: 1st. Because the verdict is for a larger sum than is claimed by the plaintiff in the cause. 2nd. Because the damages are excessive. 3rd. Because in rendering their verdict and finding the damages, the jury disregarded the instructions of the court. And 4th. Because the verdict is founded in a mistake in the calculations, by which the amount thereby assessed was ascertained.

Upon this motion the court filed the following opinion:

"The court find the damages in this case excessive and unsustained by the evidence, and unless the counsel for the plaintiff will consent to remit the sum of $894.76, so as to reduce the verdict to $1271.99, the amount which the court think really due, a new trial must be granted." The plaintiff thereupon remitted the sum of $894.76, part of the damages assessed, and the court then overruled the motion for a new trial and gave judgment for the plaintiff, and the defendant appealed.

This case was argued before ECCLESTON, MASON and TUCK, J.

*Nelson* and *Teackle* for the appellant, contended, that there was error in the instructions given and refused, and cited 6 *Har. & Johns.*, 408, *Allyn vs. Md. Ins. Co.*; and 3rd *Cushing*, 407.

*Wm. Schley* for the appellee, maintained the following points:

1st. That the appellee was not estopped, by reason of the statements made by Mr. Gill, and by his production of those statements to the appellant, from claiming his actual loss on said cargo, even if said actual loss exceeded the amount shown by said papers to have been originally claimed by him.

2nd. If the five hundred and ninety-six bags were in a damaged condition at the time of the arrival of the brig at the port of Baltimore, and such damaged condition was caused by some of the perils insured against, then such damage was a proper item to be estimated by the jury in computing the amount of plaintiff's loss.

3rd. There was no legal necessity for a formal survey of said five hundred and ninety-six bags as a condition precedent to the plaintiff's right of recovery of the said damage.

4th. There was no legal necessity for a sale of said five hundred and ninety-six bags at public auction, or by any third party, as a condition precedent to the plaintiff's right of recovery of his said loss.

5th. There was evidence in the cause, from which the jury could find as a fact, that the plaintiff sustained some loss in respect of the damaged coffee, in said five hundred and ninety-six bags; and they were not restrained to mere nominal damages, if they found from the evidence, that there was substantial loss.

6th. The premium note ought to have been added to the invoice price of the cargo, in order to show the prime cost of the coffee.

7th. If the entire loss of the plaintiff on his cargo of coffee, exceeded the sum of $675, then the plaintiff was entitled to recover, even if the defendant's contributory proportion of such loss was less than $675.

8th, In computing the defendant's contributory proportion, the liability of the defendant should have been in the same ratio as the amount insured by the defendant bore to the sum of $18,000, and not in the ratio of the amount so insured to the prime cost of the cargo.

ECCLESTON, J., delivered the opinion of the court.

The policy on which this action of *assumpsit* was instituted, was underwritten by the appellants, for the purpose of effecting an insurance from Baltimore to Rio de Janeiro and back, by vessel or vessels, upon goods laden or to be laden on board of the barque Commerce. In regard to the amount of insurance, it is provided, that "the said goods for so much as concerns this insurance, by agreement between the insured and insurers, are, and shall be, to amount of nine thousand dollars." There is also a provision, that the company shall not be liable "for any partial loss on coffee or cocoa in bags, sugar in boxes or casks, flax-seed or rice, unless it amount to seven and a half per cent., or upwards, on the sum hereby insured."

In addition to the present policy, there were four others, upon the same cargo, effected by the appellee, the four together amounting to seventeen thousand dollars.

According to the testimony which appears in the exception the appellee shipped two thousand three hundred bags of coffee, at Rio de Janeiro, on board of the Commerce bound to Baltimore. Being much injured by bad weather the vessel was obliged to put into Barbadoes, where, upon survey, she was condemned and sold. Forty-five bags of the coffee were sold at Barbadoes, and the proceeds applied to the payment of expenses. Seventy-four bags were shipped on board of the Wm. J. Watson, bound for Philadelphia, and the residue of the coffee came to Baltimore in the brig Bermuda. The portion sent to Philadelphia was all damaged and sold. After the arrival of the Bermuda at Baltimore, Joseph Withers was employed by the plaintiff to select from the cargo such parts of the coffee as he might believe not to be damaged.

Withers states, " that he found a large part of said coffee was damaged, and that he picked out five hundred and ninety-six bags of said coffee which he believed to be undamaged, and weighed the same." He also stated, that whilst he was weighing the coffee, the surveyors, Jackson and Pearson, tried it with the tryer, and told him that he was mistaken, that it was all more or less injured; that he then tried it and found it all more or less musty; that he had been misled by the appearance of the bags; that said five hundred and ninety-six bags of coffee were sent to the warehouse of the plaintiff, and the balance of the coffee brought by the Bermuda, was sent to the auction rooms of R. Lemmon and Co. The witness Withers, further says, that the five hundred and ninety-six bags of coffee were dry, but that coffee may be injured by being in contact with anything damp, as being in contact with other bags of coffee that are damp; that dampness, in any way, will injure coffee and render it musty. On cross-examination by the counsel of the defendants, he stated, "that the plaintiff was present some part of every day while witness was selecting and weighing the above mentioned five hundred and ninety-six bags of coffee, but was not present all the time, or long at a time."

The coffee which came in the Bermuda was surveyed in Baltimore, by T. R. Pearson and W. R. Jackson. According to their certificate, which includes the portion selected by Withers as above stated, the balance of the cargo was all more or less damaged by sea water—twenty-three bags of which were taken from the hold in bulk, so much injured, that they recommended the same should be sold forthwith. They also certified, that if the coffee had arrived in a sound state, it would have been worth, in Baltimore, at six months credit, an average of seven and fifty-three hundredths cents per pound.

W. R. Jackson being examined as a witness on the part of the plaintiff stated, that he was one of the persons who made the survey and valuation of the coffee; that he was employed by the plaintiff for that purpose, together with T. R.

Pearson; that he believed the statements made in said survey and valuation were true; that a part of the coffee was taken to the warehouse of the plaintiff and there stored, but he had a very indistinct recollection about it, and could not say whether that coffee was damaged or not.

The plaintiff also examined T. R. Pearson as a witness, who stated, that he, together with W. R. Jackson, at the instance of the plaintiff, made said survey and valuation; that to the best of his recollection, the five hundred and ninety-six bags of coffee, which were selected by Withers and sent to the plaintiff's warehouse, were all more or less damaged.

The Bermuda arrived in Baltimore on the 13th of April 1847, and discharged her cargo from the 16th to the 21st of that month, and in a few days after, the coffee taken to the auction rooms of R. Lemmon and Co., was sold.

The defendants proved by John Gill, that in May or June 1847, the plaintiff placed in his hands the papers necessary for the purpose of making statements of his loss and damage on the cargo of coffee. The witness at the instance of the plaintiff, made the statements marked A and B, and delivered them to him. The said John Gill had been a notary public in the city of Baltimore for more than forty years, and accustomed to make out statements of losses under policies of insurances by the various insurance companies in the city, and he considered himself familiar with the usages in that respect. The statements A and B he said were correctly made, according to the usage of the city, with the simple exception, that he had neglected to deduct three per cent. from the value which the coffee would have amounted to if it had arrived at Baltimore in a sound state; the witness having overlooked the fact, that the valuation in the survey was based upon the supposition of a sale at six months credit instead of cash. He afterwards made the statement marked C, in which this error is corrected, which latter statement he considered correct in all respects, according to the usage in Baltimore, and this reduced the loss, below an average, under the policy in in this case. The witness further stated, that when the plain-

tiff brought his papers, he gave no particular directions, but asked him to make out the claim in the usual form.

After receiving the papers, A and B, from Mr. Gill, the plaintiff presented to the defendants his claim, based upon those papers, and received payment accordingly. A few days after, an officer of one of the insurance companies concerned in this risk, informed the president of this company of the error committed by Mr. Gill in not deducting the three per cent. The president, being convinced of the error by an examination of the papers, called upon the plaintiff to refund the money. He was urged to do so, because he was informed of the error before the money was received by him; and he was told, that if he would return the money the defendants would pay the amount that might be due at any time, as soon as they were satisfied that the statements were correct. He replied, he would see about it, and next day he called and repaid the amount of cash which he had received, retaining the premium note, which had been given up to him, and that he still holds.

A correspondence took place in regard to the plaintiff's claim, between Mr. Marshall, as counsel for him, and the president of the company. The note of the president speaks of two different statements of his loss having been furnished by the plaintiff, each differing from the other; and then he says, "your note appears to differ from each of those." The last letter of Mr. Marshall, dated the 3rd January 1848, shows what is the difference between the claim as presented by him, and that by the plaintiff himself. He says, "I found, however, that the notary to whom he had entrusted the presentation of his claim, had undertaken to apportion this loss among the several offices with which Mr. Wilson had insurance, and to claim from each its proportional part of this loss, respectively, to the amount it had subscribed; and by this means a question had been raised, whether Mr. Wilson's loss amounted to seven and a half per cent. upon the amount insured by you?" To such an apportionment Mr. Marshall positively objects, and insists, that this company shall pay the whole loss.

In the statements made by J. Gill in adjusting the loss, it will be seen, that the premium notes are not added to the invoice value.   To sustain the correctness of such an omission the defendants produced evidence to show, that it was in accordance with the usage in Baltimore.   The witnesses examined on that point were John Gill, Mr. Baldwin, a clerk or secretary of the Mutual Safety Insurance Company of New York, at their agency in Baltimore, E. Didier, the president of the Mutual Fire and Marine Insurance Company of Baltimore, Captain Graham, former president of the defendants, and Samuel Thompson, president of the Atlantic Mutual Insurance Company of the city of Baltimore, and formerly president of the Baltimore Insurance Company.   The last witness says, he has been familiar with the mode of stating and adjusting marine insurance losses since 1837, and before that time.   J. Gill has been a notary public for upwards of forty years, and accustomed to make out statements of such losses. And the four witnesses unite in proving it to be the usage in the city of Baltimore not to add the premium to the invoice value.

The five hundred and ninety-six bags of coffee, selected by Withers, were not included in the statements of the plaintiff's claim; nor were the defendants ever notified that this portion of the coffee which went to the warehouse of the plaintiff, was injured, or that they would be required to make good any loss on account thereof, until during the trial of the cause. At least, there is nothing in the record to show any such claim at an earlier date, and we know nothing of the coffee after it went into the posession of the plaintiff.   Whether it was sold at private or public sale, or for what price, or what became of it, we are not informed.

At the trial it became an important inquiry, whether the plaintiff was entitled to any damages, and if any, to what amount on account of the five hundred and ninety-six bags of coffee?   And on this subject his first prayer was presented, which the court gave, instructing the jury, "that if they shall find from the evidence in the cause, that the coffee of the

plaintiff contained in the five hundred and ninety-six bags, which was removed, whilst the vessel was discharging, to the plaintiff's warehouse, was, at the time of its arrival at the port of Baltimore, in a damaged condition, and that its said damaged condition was caused during the voyage from Rio de Janeiro to Baltimore, by some of the perils insured against by the defendants, then the jury, in estimating the plaintiff's loss on the cargo of coffee which arrived at Baltimore, may and ought to include, as an item in the computation of the plaintiff's loss on his cargo of coffee, such amount as, from the evidence in the cause, they may find to have been the plaintiff's loss in consequence of said damaged condition of said coffee in said five hundred and ninety-six bags." This instruction submits to the jury not only the question, whether this portion of the coffee was injured, but also the amount of the damage. Of course, it assumes that there was such evidence before them as would, in such a case, authorise them to ascertain and assess in damages the extent of the injury. In this view of the subject, we think the court below were in error.

An agent appointed by the plaintiff for the express purpose of selecting from the cargo the sound coffee, in the discharge of that duty, took out as undamaged the five hundred and ninety-six bags. During the selection and weighing, the plaintiff was present, each day, for a short time. The coffee was taken to his own warehouse, and there is no testimony to show what became of it afterwards. After the selection was made, and whilst the coffee was being weighed, according to the testimony of the agent, (Withers,) the surveyors tried said bags of coffee with the tryer, and told him he was mistaken, that it was all more or less injured. Withers then tried it and found it all more or less musty. He says he had been misled by the appearance of the bags, which were dry; that dampness in any way will injure coffee and render it musty, and that an injury of this sort may result from being in contact with other bags of coffee which are damp. The surveyor, Jackson, recollected that a portion of the coffee was

taken to the warehouse of the plaintiff and there stored, but he had a very indistinct recollection about it, and could not say whether it was damaged or not. The other surveyor stated, "that to the best of his recollection, the five hundred and ninety-six bags of coffee which were selected by Withers and sent to the plaintiff's warehouse, were all more or less damaged." He also proved, that if this coffee had arrived in a sound state, its value would have been $7.53 per one hundred pounds, if sold at six months credit. Allow this testimony its full force and effect, and all it can prove is, that the coffee was more or less damaged. How was it possible for the jury, from this, to ascertain the amount of injury? It was said by the counsel for the appellee, they had before them the sales of the other part of the cargo, showing the loss on that, which would be some guide in regard to this. But that could afford no assistance. The testimony did not profess to draw any comparison between the two parcels. And it must be evident that there was a manifest difference between them, for one parcel was condemned as unsound and damaged, whilst the other was selected as being sound, and was actually received and stored as such by the plaintiff. The witnesses did not say, that the coffee in the five hundred and ninety-six bags was damaged more or less than the residue of the cargo. And even if they had, it would have been very vague and indefinite. But they simply said it was more or less damaged, without giving any *data* with which to compare the more or less. Such testimony leaves the jury nothing to guide them but speculation and conjecture.

Supposing that the plaintiff sustained any loss, the means of proving it must have been known to him, whilst the defendants were lulled into security by his conduct. Taking the coffee to his warehouse, after a selection made by his own agent, selling the balance of the cargo at auction, and presenting his claim for damages, excluding the five hundred and ninety-six bags; then placing his claim in the hands of counsel, who, in urging payment, made no demand on account of this coffee, the defendants might well have supposed

that no such loss as is now insisted upon, ever did occur. And believing this, it could not be expected that they would feel any necessity of having this portion of the cargo examined, to prove its soundness or the *quantum* of injury it had sustained. The proof offered, not only does not bring home to them the slightest knowledge of any damage, but it all tends to justify the conclusion on their part, that this coffee was sound.

The fact of unsoundness, and particularly the degree of it, is rendered exceedingly doubtful and uncertain, in consequence of the failure on the part of the plaintiff to produce evidence of any loss on the sale. From the length of time, it is fair to presume, that a sale was made before the trial of the cause. If so, and there was a loss, why did not the plaintiff produce the proof of it? The failure to do so justifies an inference, that there was no loss, or if any, it was so inconsiderable as not to be of any avail. If there had been no sale and the coffee was still in the possession of the plaintiff, that fact might have been disclosed and an opportunity given to have it examined. Certainly no inference favorable to the plaintiff could have been drawn from an opposite course of conduct.

In *Park on Insurance*, 126, *(old Ed.,)* he notices the Hamburg ordinances, by which it is required that in case of damage to goods, the assured shall not open them, except in the presence of the assurers or their deputies, and if time and circumstances afford no opportunity for them to attend, yet the goods are not to be opened, but in the presence of a notary and some witnesses. He admits, that in the English law of insurance there is no such regulation, and that it has not been adopted in practice. But he says: "Indeed, it seems to be needless; because an assured, in order to entitle himself to recover for a partial loss, must prove by disinterested witnesses, to the satisfaction of the jury, the quantity of goods damaged in the course of the voyage. The parties may, however, insist upon being present."

On the present occasion, the conduct of the plaintiff fully

justified the belief on the part of the defendants that they were not to be charged with any loss on the five hundred and ninety-six bags. Nothing occurred to change this belief until the trial of the cause. And then the coffee, through the agency of the plaintiff, had been so disposed of as to deny the assurers any opportunity of having it examined. Under such circumstances, the proof of loss and the extent of it ought to be clear and satisfactory. A contrary doctrine would be calculated to work great injustice, by placing the insurers quite at the mercy of the insured, and would offer a strong temptation for the latter to withhold from the former the proper means of ascertaining the real condition of the goods.

The instruction authorised the jury to allow such an amount of damages as they should find equivalent to the plaintiff's loss; when, in our judgment, the testimony was so indefinite and unsatisfactory, as to furnish no legitimate *data* upon which to estimate the *quantum* of loss. And that, in the absence of proof, which, if any such existed, the plaintiff might have produced, and which, by reason of *his* conduct, the defendants could not. We therefore think the court erred in granting the plaintiff's first prayer.

The second and third prayers presented by the plaintiff were refused by the court, but no exceptions were taken.

The defendants then presented seven prayers. The first, second, third and seventh were refused, and the fourth, fifth and sixth were granted.

To the granting of the plaintiff's first prayer, and to the refusal of the defendants' first, second, third and seventh, exceptions were taken, but none to the granting of the defendants' fourth, fifth and sixth.

The first instruction asked by the defendants, was the following: "If the jury find from the evidence that the plaintiffs, on the — day of —, eighteen hundred and forty —, shipped on board the barque Commerce, at Rio Janeiro, two thousand, three hundred bags of coffee, of the value shown by the invoice offered in evidence in this cause; that said barque, in

the prosecution of her voyage home to Baltimore, whilst laden with said coffee, was compelled to put into Barbadoes in distress, and upon survey, as shown by the evidence of the plaintiffs, was ordered to be discharged of her cargo and sold; that in pursuance of said order, she was so discharged and sold; that twenty-one hundred and seventy-four bags of said coffee, part of said cargo of said barque Commerce, were duly transshipped in the brig Bermuda from Barbadoes to Baltimore, and seventy-four bags, likewise part of said cargo, were so transshipped in the brig Wm. J. Watson to Philadelphia, forty-five bags of said cargo having been appropriated by Trowbridge and Hays, the agents at Barbadoes, to the expenses there incurred; that said brig Bermuda arrived at Baltimore on the 13th day of April 1847, having on board said coffee, so transshipped from Barbadoes; and that the said brig Wm. J. Watson arrived at Philadelphia on the — day of —, eighteen hundred and forty-seven, having on board the coffee transshipped by said brig from Barbadoes; that after the arrival of said brig Bermuda at Baltimore, the survey and estimate offered in evidence by the plaintiffs, were made by —— Jackson and —— Pearson; that in pursuance of the recommendation of said surveyors, fifteen hundred and eighty-five bags of said coffee were sold by R. Lemon & Co., for the amount shown by their account of sales offered in evidence by the plaintiffs; that after the arrival of the brig Wm. J. Watson at Philadelphia, the survey and sale of the seventy-four bags which arrived at that port were made, as offered in evidence by the plaintiffs; that the plaintiffs thereupon placed their papers relating to said voyage and cargo in the hands of John Gill, a notary public, with a request that he would make a statement showing the amount of loss sustained by them by the damage done to said coffee; that in pursuance of said request, said Gill made, according to the usage of insurances in Baltimore, the statement of which the paper offered in evidence by the defendants marked A, is a copy, based upon the papers so placed in his hands by said plaintiffs; that on the eighth day of June, or in a few days thereafter, said state-

ment, so made by said Gill, with the paper, a copy of which is likewise offered in evidence by the defendants, marked B, (which was also made out by said Gill at the instance of the plaintiffs,) was presented by the said plaintiffs to the defendants, as showing the amount of their claim upon said loss; that in making said statement A, the said Gill, by inadvertence, omitted in estimating the value in cash of said coffee, if the same had arrived in a sound state at Baltimore, to deduct three per cent. from its amount, and that the statement C is a correct statement of said loss, as shown by the papers so placed in the hands of said Gill by said plaintiffs, that then the said plaintiffs are not entitled to recover in this action, because of the damage sustained by said coffee as aforesaid."

There are two propositions, both of which must be correct or else this prayer was rightfully rejected. One is, that there was not sufficient evidence in relation to the amount of damages sustained by the five hundred and ninety-six bags of coffee, to authorise the jury to allow the plaintiff on that portion of the cargo anything more than merely nominal damages. The other is, that in reference to the alleged usage in the city of Baltimore, that the premium is not to be added to the invoice value in estimating a loss, the evidence on the point was properly before the jury, and if, from it, they believed such to be the usage, they were bound by it in estimating the amount of damage sustained by the plaintiff.

The first of these propositions has been sufficiently discussed, whilst speaking of the plaintiff's first prayer. From what is there said it will be seen, that we here agree with the appellants' counsel.

On the subject of the usage many authorities were cited, to show that in estimating losses the premiums should be added to the invoice value. And they certainly do establish such to be the general practice in England and in the United States. It is, however, but a commercial usage of long standing, which may be controlled, changed or modified by a different custom, well sustained by proof, a knowledge of

which is brought home to the party, either by positive and direct proof, or constructively by circumstances.

The rule of allowing three days grace, and requiring the demand of payment on the third, is as general in the United States and in England as the one now under consideration, and yet we find, by the decisions in 6 *H. & J.*, 172, and 1 *H. & G.*, 239, a custom of many years standing at the Bank of Columbia of demanding payment on the fourth day, was held to be binding upon the parties who dealt with the bank. In the first case, the court speak of the universality of the three days rule, and recognise it as being the general law of such contracts, but declare it not to be so inflexible as to admit of no innovations. On the contrary they hold, it may be altered and controlled by agreement of parties, or by usage and custom. In 1 *H. & G.*, 248, the learned judge says: "A usage of universal prevalence becomes a part of the existing law, and is to be noticed *ex officio* by the courts of justice; but a particular usage has a circumscribed and limited application, and must be supported by proof. Where it is well established, it is as obligatory on the objects of its operation as the general law." On page 250 it is declared, that "the usage enters into the contract and becomes part of it, and must be regarded in the interpretation of it." This was said whilst answering the argument pressed upon the court, that the usage of the Bank of Columbia was repugnant to the general law of the District, and therefore unlike the usages decided upon in the cases which had been cited. But this argument availed nothing, because the court held, "that the contract is not made with reference to the general rule, where the particular rule is *presumed* to be in the knowledge of the party." After commenting upon several cases of particular usages, two of which relate to policies of insurance, the judge remarks: "It is believed many other cases might be produced where special usages have been decided to control and govern the general law repugnant to them, but the court are fully satisfied on the point, and deem it unnecessary to multiply references to authorities."

1 *Duer on Ins.*, 258, and other portions of the second part of the second lecture, which treats very fully of the subject of usage, were referred to in opposition to the usage relied upon in this case. Among other objections urged it was contended, that according to the principles set forth by this author, the usage was not sufficiently general, but too limited, being confined to the city of Baltimore. But in the 57th section of the same lecture, Duer says: "The proposition that a usage must be general in order to bind the parties, refers exclusively to the cases in which the knowledge of the parties and their intention to adopt the usage, are inferred merely from the fact of its existence; but when their knowledge or intentions are established by other direct or circumstantial proof, their contract will be governed by the usage, however local or partial, in reference to which it is proved or presumed to have been made." From this, and what is said in 1 *H. & G.*, 239, on the subject of knowledge, it may be correctly assumed, that in this case there was evidence before the jury proper for their *consideration*, both in regard to the existence of the usage and as to the knowledge thereof by the appellee.

In the case of *Allegree vs. The Maryland Insurance Company*, 6 *H. & J.*, 408, proof of usage was allowed. There it was contended, that such usage only as related to the course of the voyage could be received in evidence. But the court thought, the terms of a policy might be as well explained by other commercial usages as by the usage of trade, applicable only to the course of the voyage.

We have seen the united testimony of four witnesses in support of the usage here relied upon. One of them speaking of his knowledge since some time prior to the year 1837; another going back as far as forty years. And no proof of a conflicting character was offered. Whilst the plaintiff has virtually admitted the existence of such a rule. He, being a merchant of long standing in the city of Baltimore, having received from Gill the statement A, based upon this rule, presented his claim for damages, assuming that statement to be correct. And so far as we are informed by the evidence,

31      v.2

there is no reason to believe that the correctness of this rule was ever denied by the plaintiff, or his counsel, until the cause came before the jury.

If the propriaty of granting this first prayer of the defendants had rested exclusively on the question, whether the jury were bound by the usage if they believed that the proof was sufficient to establish its existence, it is very clear that this instruction would have been given, because the same principle was recognized by the court in granting the sixth prayer of the defendants. But this prayer, no doubt, was refused, in consequence of being in conflict with the plaintiff's prayer, which had been granted, in relation to the five hundred and ninety-six bags of coffee.

From an examination of the statements made by J. Gill, it will be seen, that unless the plaintiff had a right to claim an allowance of more than nominal damages for loss on the coffee in the five hundred and ninety-six bags, or unless he was entitled to insist, that in ascertaining the partial loss on the cargo, the premium notes should be added to the invoice value, his loss would not amount to an average under the policy.

The evidence relating to the five hundred and ninety-six bags of coffee, we consider too indefinite to warrant the jury in giving more than nominal damages. And the proof respecting the usage of omitting the premium in stating a partial loss, was very proper to be submitted to the jury for them to consider and decide upon. The existence of this usage is one of the matters admitted in the prayer as necessary to be found by the jury to authorise the conclusion, that the plaintiff was not entitled to recover. In the enumeration of the things to be believed by the jury, the last is, "and that the statement C is a correct statement of said loss, as shown by the papers so placed in the hands of the said Gill by said plaintiffs." This, of course, requires the jury to find the existence of the usage, because the statement is based upon it, and if that was not sustained by proof, the jury could not find the statement to be correct. Reference is likewise

made to this usage in a previous part of the prayer, when speaking of the usage of insurances in Baltimore.

We did not understand the counsel of the appellee as making any opposition to the correction, in paper C, of the error in paper A, arising from the omission to deduct three per cent. from the valuation of the coffee, which correction was said to be proper in consequence of the valuation in the survey having been made on the supposition of a sale at six months credit, instead of cash.

After full consideration of the subject, we think the plaintiff was not entitled to recover, if the jury, from the evidence before them, were satisfied of the existence of the facts set forth in the defendants' first prayer; and therefore, in our judgment, it ought to have been granted.

The second of the defendants' prayers takes the position, that if, after the survey at Baltimore, the plaintiff, knowing the condition of the coffee, took to his own store five hundred and ninety-six bags thereof, and disposed of the same without notice to the defendants, then the plaintiff was not entitled to recover for any damage sustained by said coffee. We cannot yield our assent to the proposition, that such conduct of the plaintiff, of itself, could shut out all claim for any damage, and we agree with the county court in the propriety of refusing the instruction.

The third prayer on the part of the defendants is, "that the plaintiffs have offered no evidence upon which the jury can allow damages for any injury sustained by said plaintiffs in regard to said five hundred and ninety-six bags of coffee."

The defendants' senior counsel admitted, that upon examination of the authorities he was inclined to believe this prayer could not be sustained, there being proof of some damage, although not sufficient to enable the jury to ascertain the amount. Under which circumstances the jury might allow nominal damages. The prayer was properly refused, according to the authorities cited in relation to the seventh prayer.

The defendants, in their seventh prayer, asked the court to instruct the jury, that upon the evidence offered they could

not allow damages for the injury done to the five hundred and ninety-six bags of coffee, taken by plaintiff to his store, if any such damages should be found by them to have been done, other than such as were merely nominal.

Our assent to the proposition contained in this prayer necessarily follows from what has been said in the previous part of this opinion. In confirmation of the correctness of this view of the subject we refer to the cases of *Feize vs. Thompson*, 1 *Taunt.*, 121; and *Tanner vs. Bennett, Ryan and Mood*, 182. See also the cases collected and commented upon in *Sedgwick on the Measure of Damages, chapter 2.*

It was said in argument on the side of the plaintiff, that if there was proof of any damage, no matter how indefinite as to the amount, it cast the *onus* upon the defendants to show that it was less than seven and a half per cent. But it cannot be so. By the express terms of the policy, the insurers are not liable for any partial loss on the coffee in bags, unless it amount to seven and a half per cent., or upwards. As there is no responsibility resting upon the defendants for a loss below this, the plaintiff must be required in this, as in all similar cases, to bring his claim, by proof, within the provisions of the contract. A defendant is not bound to produce evidence in defence until his liability is first made to appear, either by proof or by the state of the pleadings.

The counsel for the plaintiff contended, that if we should think there was error in any of the opinions of the county court, to which exceptions had been taken, it would then be proper to examine the opinions expressed upon the prayers, where there had been no exceptions. And if we should think there was error in any of these, to such an extent, that if those points had been correctly decided below, then the case should not be sent back under a procedendo, because, upon a full consideration of the law involved in the case it would be seen that the defendants had not, in truth, sustained any injury, and therefore should not have the benefit of a new trial.

Without stopping to inquire whether the decisions not excepted to are properly before us, for the purpose thus disclos-

ed, it is sufficient to say, that after examination, we find no error in them.

The judgment will therefore be reversed, and the case sent back.

*Judgment reversed and procedendo awarded.*