ALPHEUS R. APPLEMAN *vs.* JOHN H. FISHER, HARRY FISHER and PARKS FISHER, trading as WM. FISHER & SONS.

JNO. H. FISHER, *et al.,* trading as W. FISHER & SONS, *vs.* ALPHEUS R. APPLEMAN.

*Usage—Sales of Gold "Short"—Delivery—Margin.*

A, a banker and broker in Hagerstown, having an account current with F & Sons, bankers and brokers in Baltimore, contracted, on the 31st of March, 1869, through a telegraphic correspondence, conducted mostly in cipher, to sell to the latter "$100,000 gold, *short,*" at $1.31. This amount of gold, at the price agreed on, was credited by F & Sons to A, and carried by them for him until the 24th of September, 1869, when A.'s account being, as they claimed, deficient in *margin,* they purchased gold in New York at $1.35 to fill his contract, the gold being actually delivered to them on the 2d of October. A repudiated this purchase, and on the 4th of October, 1869, ordered F & Sons to purchase the gold for his account at its then rate, viz: $1.29 to $1.30. Upon their declining to do so, he, on the 10th of January, 1870, made actual tender of the gold in Baltimore, and demanded the contract price of $1 31, gold being quoted on that day in Baltimore at $1.22 to $1.22⅛. The tender was refused, and A brought an action for the difference between the contract price and the market price of gold on the day of the tender. At the trial, evidence was offered on both sides, showing that a sale of gold *short* meant a sale of that which the seller has not, but which he expects to buy in at a lower price than that for which he sells, that the contract may be consummated upon the order of either party, but that, during its pendency, the buyer or seller is entitled to a *margin* for his security as gold may rise or fall in the market; this *margin* must be in money or its equivalent in securities, and equal to from five to ten per cent. on the contract price of the gold, over and above its market price at any time; if the *margin* be not kept up as gold advances, the buyer has the right to buy in the gold for account of the seller, and charge him with the loss; that such usage prevailed in Baltimore and New York, but was not known to prevail in Hagerstown. HELD:

1st. That from the very terms employed in the contract, it is manifest that it was made in reference to some usage in the contemplation of the parties.

Appleman *vs.* Fisher, *et al.*

2d. That a contract to sell gold, deliverable at a future day, like a contract for a similar sale of stock, is not illegal.

3d. That whether the usage prevailed in Hagerstown, is wholly immaterial, the question being whether the parties contracted with reference to the usage existing in Baltimore.

4th. That if usage be adopted by implied or tacit understanding, it is as obligatory upon the parties as if incorporated with the contract itself, provided the usage be not repugnant to or inconsistent with the terms of the contract, or in contravention of existing rules of law. In this case, without its aid, the contract would be unmeaning and senseless.

5th. That usage, however local and partial, will govern a contract proved or presumed to have been made in reference to it.

6th. That the usage proved in this case seems to be reasonable.

7th. That in this case, from the nature of the contract, it is plain that it was not intended that the seller should deliver the gold in Hagerstown.

8th. That the amount of *margin* is to be fixed and regulated by the price of gold in Baltimore, in the absence of any stipulation to the contrary.

CROSS-APPEALS from the Superior Court of Baltimore City.

This was an action brought by the appellant in the first of the above cases, to recover damages growing out of an alleged breach of a contract with the appellees for the sale of gold. At the trial below, the plaintiff excepted to the admissibility of certain evidence taken under a commission in New York on the part of the defendants, to prove the fact of the actual purchase of the gold by them on the 24th of September; that it was made by a regular broker at the Gold Board; that the Gold Board was the usual place of buying gold; that the price, $1.35, was the best that could be had at the time; and that the gold was actually delivered, and paid for by the defendants through the New York house.

The plaintiff also excepted to the admissibility of all the testimony of certain brokers and merchants as to the usage in Baltimore and New York, with reference to the sale of gold or stock *short*. The Court overruled both exceptions.

The plaintiff offered the following prayers:

1st. If the jury shall find from the evidence that the plaintiff, on the 31st of March, 1869, sold to the defendants the gold in question, at the price specified in the telegrams given in evidence, and that the same was deliverable at any time thereafter, on the respective demand of either party, and shall find that the plaintiff tendered the same to the defendants, on the 10th day of January, 1870, and that the defendants refused to receive and pay for the same, then the plaintiff is entitled to recover such difference in value as they shall find to have existed in gold in the market, on the said two named days, from the evidence, with such interest as they may deem proper to allow under all the circumstances.

2d. That if they shall find that the plaintiff lived in Hagerstown, and the defendants lived in Baltimore, and that such contract was made by the telegrams given in evidence, that then the same is not affected by any custom or usage peculiar to brokers and merchants dealing in gold in Baltimore only, and that the plaintiff is entitled to recover, notwithstanding they may find that by custom and usage among such brokers and merchants, they had a right among each other upon such contracts to demand margins, and a right to close out the same on non-compliance therewith, unless they shall find that such usage and custom was universal, general, uniform, certain and notorious, or that the same existed in Hagerstown, and of this there is no evidence.

3d. That if the jury shall find as set forth in the first prayer, then the plaintiff is entitled to recover, unless they shall find that as a part of said contract, by usage and custom obligatory upon the plaintiff, the defendants were entitled to call for margin for security thereof, and to purchase said gold in non-compliance with such demand, and also that in this case there was such a demand; and of all which there is no evidence.

4th. That if the jury believe the plaintiff resided and did business as a banker in Hagerstown, and that the purchase of

gold specified in the telegrams given in evidence was made by the defendants of the plaintiff, that by the terms thereof the same was deliverable at the place of sale thereof, and was not deliverable in Baltimore, and that before the plaintiff could be in default in regard thereto, some demand must have been made upon him at the said place of sale for performance of said contract there, and that no usage or custom of Baltimore city, not proved to exist elsewhere in Maryland, can in any manner affect the performance of said contract or the rights or liabilities of the parties thereto, unless they shall find that said usage and custom did exist at the said place where said contract was made.

5th. That if the jury shall find that on the 22d of September, 1869, by usage and custom obligatory upon the plaintiff, the defendants had a right to call for margin, and that at said time with the collaterals then on hand of the plaintiff at the then price of gold, the sum of $5,000 was the amount of margin proper to be demanded, and that on said day the defendants demanded by letter said sum, and that before compliance could be had gold had *receded* in price equal to $7,500 on the amount of the purchase, then the right to demand said $5,000 had ceased, and that plaintiff was not in default until some new and fresh demand for margin, properly entitled to be made, was made by defendants of plaintiff, and that he had failed to comply therewith in a reasonable time thereafter.

6th. That if the jury shall believe that the said gold was bought, as alleged, in New York, on the 24th of September, 1869, for delivery, and that the same was not and could not have been delivered by the seller until the 2d of October, 1869, then said seller was in default, and it was the duty of the defendants not to have received said gold, save at the price or value thereof on said last mentioned day; and if they shall find that on that day gold had fallen in price, then, in no aspect of this case, can the defendants charge the plaintiff with a higher value for said gold than it was on the day when the seller was first able and did deliver the same.

The defendants offered the following prayers:

1st. That if the jury find that the meaning of the word "*short*," used in the contract offered in evidence, in connection with a sale of gold, as established by the usage applicable to sales of gold of the kind mentioned in evidence, is that the seller has not the gold at the time of sale, but sells with the expectation of being able to buy gold for delivery at a lower price, and that by said usage a sale short of gold implies that the seller shall at all times during the running of the contract keep in the hands of the buyer or in the hands of some third party agreed upon between seller and buyer, an amount in cash, or securities equivalent to cash, equal to the difference between the price at which the gold is sold short, and its market value on any given day, and a further amount in money, or the equivalent of money, equal at all times to five per cent. on the market value of gold on any day, and that by said usage a sale of gold short further implies that in the event of the failure of the seller at any time to keep in the hands of the buyer security in money, or its equivalent in securities, at a cash valuation, to the extent above stated, the buyer may purchase the gold at the best rate at which the gold can be bought, and charge the seller with the loss that may be thereby incurred. And if they shall further find that on the 24th of September, 1869, the plaintiff had failed, upon the demand of the defendants, to place in their hands money or securities to the extent of the difference between the contract price and the lowest price at which gold could have been purchased on that day in the city of Baltimore, and five per cent. on the value of said gold in addition, and that the defendants thereupon purchased said gold at the lowest price they could buy the same at the time of said purchases, the plaintiff is not entitled to recover.

2d. That assuming that the defendants improperly closed the plaintiff's account by the purchase of gold on the 24th of September, 1869, at $1.35, the plaintiff is only entitled to recover the difference between $131,000 and interest thereon,

until the 6th of October, 1869, and the lowest price at which the jury may find the defendants could have bought gold in the Baltimore market according to the instructions contained in the plaintiff's letter of October 4th, 1869, provided the jury shall find that said letter was written and received by the defendants, and provided the jury find that by the usage the defendants were bound to execute the said order of the plaintiff in said letter of October 4th, 1869.

3d. If the jury find that the plaintiff sent to the defendants as margin on his contract with them 4,000 of Washington county bonds, and that defendants objected to receive said bonds as margin and that the plaintiff thereupon promised to replace said bonds with money and failed to do so before the 24th of September, that after such failure the plaintiff is not entitled to require the defendants to treat said bonds as available margin, provided the jury find the usage as to margin set forth in the defendants' first prayer.

The Court rejected the first, second, third, fourth, and sixth prayers of the plaintiff, and refused to grant his fifth prayer as offered, but granted the same after modifying it by inserting the words "*in Baltimore*" after the word "*receded.*"

The prayers offered by the defendants were granted.

To the refusal of the Court to grant the prayers of the plaintiff, and each of them as offered, and to the granting of the prayers of the defendants, the plaintiff excepted.

The defendants excepted to the granting of the fifth prayer of the plaintiff as modified by the Court.

The verdict was for the plaintiff for $1,061.50, and judgment was entered accordingly. The facts are stated in the opinion of the Court.

Both parties appealed.

The cause was argued before STEWART, MAULSBY, GRASON, MILLER and ALVEY, J.

*Geo. H. Williams,* for Appleman.

The usage attempted to be set up in this case, was not proved to exist elsewhere in Maryland than in Baltimore, and all evidence in regard thereto should have been ruled out.

It was not only not a general, uniform and notorious usage, but it was an unreasonable one, contrary to law, and such as Courts would not imply or enforce. *The Chesapeake Bank vs. Abell,* 29 *Md.,* 500; *Citizens' Bank vs. Grafflin,* 31 *Md.,* 518; *Rosenstock vs. Tormey,* 32 *Md.,* 179; *Thompson vs. Riggs,* 5 *Wallace,* 679; *Mutual Safety Co. vs. Hone,* 2 *Coms.,* 238; *Beirne vs. Dord,* 1 *Selden,* 97; *Markham vs. Jaudon,* 41 *N. Y.,* 239; *Oelrichs vs. Ford,* 23 *Howard,* 63; *Oelrichs vs. Artz,* 21 *Md.,* 510; *Barnard vs. Kellogg,* 10 *Wallace,* 383; *Simmons vs. Law,* 40 *N. Y.,* 219.

Assuming that such usage was binding upon the parties, and that the plaintiff was in default, and that the appellees had a right to buy the gold by reason of his default, yet they had no right to charge him with any different rate than that of the day when they themselves did in fact take the gold from the New York vendor.

*Charles Marshall* and *Wm. Henry Norris,* for Wm. Fisher & Sons.

The custom or usage which the plaintiff offered in evidence to explain the meaning of a short sale, was the custom or usage in Baltimore and New York. The evidence offered by the defendants, of custom or usage, was of that of Baltimore and New York also.

Without some explanation of the word *"short,"* the contract between the parties was as unintelligible to the common mind as if it had never been translated from the enigmatical language of the telegrams by which it was made.

The plaintiff denies the admissibility of the proof of usage and custom in Baltimore and New York, to explain the meaning of a *"short"* sale, and asserts that no usage could

govern the contract between these parties, except an usage, "universal, general, uniform, certain and notorious," or an usage which "existed in Hagerstown," and claims that "of this there is no evidence." It will thus appear that the plaintiff denies the admissibility of the proof of that usage and custom which he had himself introduced to explain the contract, and did not offer any evidence whatever of the only usage which, upon his own theory, was admissible to explain his otherwise unintelligible contract. It follows, necessarily, that if his exception be sustained, all the evidence offered as to usage must be struck out of the case, and the plaintiff could not recover, because he wholly failed to prove any intelligible contract.

He can only escape from this consequence by reading the contract as if the word "*short*" did not occur in it.

But if this word be omitted, and the contract be reduced to a simple sale of $100,000 gold, by the plaintiff to the defendants on the 31st of March, 1869, the plaintiff's first prayer must be rejected, because it calls upon the jury to find that under such a contract the gold "was *deliverable at any time thereafter on the respective demand of either party,*" which would, in effect, require the jury to find, without proof, a contract between the parties essentially different from the written contract offered in evidence by the plaintiff, and would also construe a contract to sell $100,000 gold, on the 31st of March, 1869, to mean that either party might comply with it at *any* time, instead of immediately, or in a *reasonable* time, which would be the true construction.

But the word "*short*" cannot be rejected from the contract under any principle of construction. It was used by both parties, it appears in the proposal and the acceptance, and must have had a meaning. The law does not reject a word from a contract because it is unintelligible, but because it is immaterial or repugnant to the manifest intent of the parties, as gathered from the whole contract.

While the acts of the parties under a contract cannot be offered to vary or interpret the contract, yet when any part of a contract consists of elements imposed upon it by usage, and thus incorporated in it, the acts of the parties are admissible to prove what the contract actually was, *so far as usage controls it.* *Chicago vs. Sheldon,* 9 *Wallace,* 50 ; *Merchants' Mut. Ins. Co. vs. Wilson,* 2 *Md.*, 240, 241 ; *Foley & Woodside vs. Mason & Sons,* 6 *Md.*, 49, 50 ; *Powell vs. Bradlee,* 9 *G. & J.*, 220 ; *Williams vs. Woods,* 16 *Md.*, 250-252 ; *Rosenstock vs. Tormey,* 32 *Md.*, 180 ; *Railroad vs. Trimble,* 10 *Wallace,* 367.

ALVEY, J., delivered the opinion of the Court.

Appleman, a banker and broker in Hagerstown, and Fisher & Sons, bankers and brokers in Baltimore, had dealt together in their business as bankers and brokers, and between whom there existed an open account of their transactions, when, on the 31st of March, 1869, the former, by telegraphic correspondence, conducted mostly in cipher, contracted to sell to the latter $100,000 gold, *short,* at $1.31. This amount of gold, at the price agreed on in currency, was credited by Fisher & Sons in account, and carried by them for Appleman, until the 24th of September, 1869, when they, availing themselves of what is claimed to have been their right under the contract, purchased the gold in New York at $1.35, currency, for Appleman's account to fill his contract, and charged it up to him at that price, and thus closed the transaction ; which, of course, resulted in a loss to Appleman. He now repudiates this latter act of Fisher & Sons, and insists that the gold was unjustifiably and without authority purchased at the price it was ; and, treating the contract as still open and executory, he, by letter of the 4th of October, 1869, directed Fisher & Sons to purchase the gold for his account at its then rates, which were from $1.29 to $1.30, and upon their declining to do so, he again, on the 10th of January, 1870, made actual, tender of the gold in Baltimore, and demanded to be paid the contract price of

$1.31, in currency. Gold, at this latter date, was quoted in Baltimore at $1.22 to $1.22⅛, and it is for the difference between the market price of gold on the day of the tender and the price at which the $100,000 gold was sold to Fisher & Sons, that this action is brought.

Without explanation, the contract, as embodied in the telegrams, is wholly unintelligible. To enable the plaintiff to recover on it, according to his own theory of his rights under it, it became necessary that the terms employed should be elucidated, and the intent and purpose of the parties explained. To do this the plaintiff himself offered and gave evidence of the meaning of the cipher telegrams, and also to explain the meaning of a sale of gold *short*, as understood among those dealing in that article. From the very terms employed in the contract, it is manifest that it was made with reference to some usage or custom that was then in the contemplation of the parties; and from the plaintiff's own evidence and correspondence, it is quite plain as to what usage was supposed to apply to and control the contract.

By the evidence offered on the part of the plaintiff, it was shown, that a sale of gold *short*, according to established usage, means a sale of *that which the seller has not, but what he expects to buy in at a lower price than that for which he sells.* The seller can order the gold to be bought in at any time, and the buyer can call for the delivery of it when he pleases. That the buyer or seller is entitled to a margin for his security as the gold may rise or fall in the market. This margin must be in money, or its equivalent in securities, and equal to from five to ten per cent. on the price at which the gold is sold, over and above its market price at any time; and such margin must be kept up as the value of gold fluctuates in the market, so that the buyer shall have in hand, on a rise in price, an amount in money, or its equivalent, sufficient to cover the loss to the seller caused by such rise in gold above the price at which it was sold short, with from five to ten per cent. on the contract price, added to the

amount of such loss. If this margin be not kept up as gold advances, the buyer has the right to buy in the gold for account of the seller, and charge him with the loss.

The proof, on the part of the defendants, established the existence of the same usage, and the same meaning and interpretation of the contract as that proven on the part of the plaintiff. By the evidence, as offered by them, it is shown that, by the usage, the broker is entitled to demand from the seller a margin of from five to. ten per cent. on the price at which the gold was sold short, in addition to a sufficient amount to cover any loss occasioned by a rise in gold; and that the seller has the right at any time to deliver the gold sold by him, by ordering the buyer to purchase in the amount for his account; and that the buyer has the right to buy it in on default of margin. That such usage is the same, whether the sale is made by a broker for his principal, or by the principal directly to the broker; and that the delivery is to be made at the place where the gold is purchased. That such usage prevails in Baltimore and New York, but was not known to prevail in Hagerstown, where the plaintiff resided.

It appears that, on the 22d of September, 1869, demand was made, by Fisher & Sons, of the plaintiff, for margin to the extent of $5,000; gold at that time being sold at $1.42½ in New York, and from $1.37½ to $1.40¼ in Baltimore; and on the 24th of September, it ran up in New York from $1.50 to $1.62½, but fell again in the latter part of that day to $1.33, while in Baltimore sales were made at the Gold Board at $1.50.

It was because of the alleged default of the plaintiff in not furnishing the required margin, that the gold was purchased at $1.35 in New York on the 24th of September; and the main question presented on this appeal is, to what extent was the usage admissible for the purpose of explaining and amplifying the contract as embodied in the telegrams, and determining the rights and duties of the parties under it.

This contract is not of a nature to be favorably considered, belonging as it does to a class of wagering contracts that have always been disfavored by the Courts. Indeed, if this action had been brought in an English Court a half century ago, it is more than probable that the plaintiff would have been non-suited upon the ground of the illegality of the contract. In *Bryan vs. Lewis, R. & Mood.*, 386, Lord TENDERDEN said, that he had always thought, and should continue to think, until he was told by the House of Lords that he was wrong, that if a man sells goods, to be delivered on a future day, and neither has the goods at the time, nor has entered into any prior contract to buy them, nor has any reasonable expectation of receiving them by consignment, but means to go into the market and to buy the goods which he has contracted to deliver, he cannot maintain an action upon such contract. Such a contract amounts, on the part of the vendor, to a wager on the price of the commodity, and is attended with the most mischievous consequences. And upon a subsequent occasion, according to the report as given in *Chitty on Contr.*, 2d *Ed.*, 332, the same learned Judge ruled, that "if two persons enter into a contract under the semblance of a sale of goods, not intending really to buy or sell the commodity, but merely as a gambling speculation, and to pay the difference of the market price on a particular day, *like a time bargain in the stocks*, such a contract is illegal and void at common law, and no action will lie to enforce it." But this salutary doctrine, however much its absence may be regretted in view of what is daily occurring, no longer obtains in the Courts either of England or this country. In the case of *Hibblewhite vs. McMorine*, 5 *M. & Wels.*, 462, the case of *Bryan vs. Lewis*, was expressly overruled, and it was there held, that a contract for the sale of stock, to be delivered at a future day, was not invalidated by the fact that at the time of the contract, the vendor neither had the stock in his possession, nor had entered into any contract to buy it, nor had any reasonable expectation of becoming possessed of it by the time

designated for its delivery, otherwise than by going into the market after the contract and purchasing the stock. And the principle of that case has become the established law, both in England and this country. It is said, and has been so expressly decided, that a contract for the sale of stock or marketable securities, in which the property passes by delivery, differs from a contract for the sale of a specific chattel, inasmuch as a contract for the sale of stocks or securities, such as are in the market for sale, would be satisfied by the delivery of any stock or securities of the description bargained for, and, consequently, the contract for sale cannot mean an actual sale, but only a contract to deliver. *Heseltine vs. Siggers*, 1 *Exch.*, 856. And if such a distinction be sound, of course the same may be said of the contract to sell any given amount of gold, deliverable at a future day.

There being no question as to the legality of the contract, it is insisted by the plaintiff that the contract for the sale of the gold by telegram is not affected by the usage proven to exist in Baltimore, and not in Hagerstown, where the seller resided, and that it should be construed without reference to usage, and, therefore, all evidence in regard to usage, existing only in Baltimore, should be excluded.

To maintain this proposition would, as we have said, leave the contract in an unintelligible form, and neither Court nor jury would be able to understand the meaning of the parties. To give the contract effect at all, resort must be had to what the parties had in view at the time, as the means of ascertaining their rights and liabilities. Whether the usage prevailed in Hagerstown, is wholly immaterial, the question being, whether the parties contracted with reference to the usage existing in Baltimore, and intended that their contract should be governed by it. It would certainly have been competent to them, by express reference, to have adopted the usage in Baltimore as determining the nature of the contract, and we think it equally clear that if it be done by implied or tacit understanding, it is as much obligatory upon the parties as if

incorporated into the contract itself. The principle upon which usage or custom is applied to the interpretation of contracts, is very familiar, and of constant occurrence. It may be resorted to in the absence of express stipulations, or where the meaning of the parties is uncertain or doubtful upon the language used, or where the usage of the trade or business to which the contract relates, or with reference to which it was made, may afford explanation and supply deficiencies in the instrument. Technical, local or doubtful words may be thus explained. So, where stipulations in the contract refer to matters outside of the instrument, parol proof of extraneous facts may be necessary to interpret their meaning. *Oelrichs, et al. vs. Ford*, 23 *How.*, 49 ; *Williams vs. Woods, Bridges & Co.*, 16 *Md.*, 220. As was said by PARKE, B., in *Brown vs. Byrne*, 3 *Ell. & Bl.*, 713, " in all contracts, as to the subject-matter of which known usages prevail, parties are found to proceed with the tacit assumption of these usages ; they commonly reduce into writing the special particulars of their agreement, but omit to specify these known usages which are included, however, as of course, by mutual understanding ; evidence, therefore, of such incidents is receivable. The contract, in truth, is partly express and in writing, partly implied or understood and unwritten. But the evidence received *must not be of a particular, which is repugnant to or inconsistent with, the written contract ;*" and it should have been added, nor in contravention of any rule of law. We discover nothing in the usage proved in this case, that is at all repugnant to or inconsistent with the terms of the contract, or in contravention of existing rules of law. On the contrary, it is entirely consistent with the contract, and without its aid the contract would be unmeaning and senseless. In the case of *Spicer vs. Cooper*, 1 *Q. B.*, 424, the memorandum of sale was in these terms : " Sold M. W. S. 18 pockets of Kent hops, at 100 s ;" and it was held that parol evidence was admissible to show the existence of a usage of the trade, by which a contract so worded was understood to mean 5l. per cwt., and

that the hops consequently were to be weighed, and the price ascertained, according to the weight of the article, and that the 100 s. was not to be paid per pocket without reference to the weight of the contents of each pocket. And in the very recent case of *Field vs. Leban,* 6 *H. & N.,* 617, where, upon a sale of mining shares by one broker to another, they respectively signed, bought and sold notes, the former of which being as follows: "Bought, T. F., 250 | 5120ths shares in Wheal Charlotte, at 2l. 5s. per share, 562l. 10s., for payment, half in two months, and half in four months;" and the action being for not accepting the shares, it was held, that evidence was admissible of a usage among brokers dealing in mining shares, that, in contracts relating to the sale and purchase of such shares, the delivery takes place at the time appointed for payment. And in this last case it was said, that the plaintiff and defendant must be presumed to be cognizant of the usage.

It is true that where the party is sought to be bound by a particular usage, and the only evidence of the intention of the parties to adopt it, as applicable to their contract, is the fact of its existence, such usage must be clearly shown to be *general and uniform,* so as fairly to give rise to the presumption that the parties were acquainted with it, and intended to contract with reference to it. "But when their knowledge or intentions are established by other direct or circumstantial proof, their contract will be governed by the usage, however local or partial, in reference to which it is proved or presumed to have been made." 1 *Duer on Insurance,* 258; *Merchants' Mutual Ins. Co. vs. Wilson,* 2 *Md.,* 217; *Foley & Woodside vs. Mason,* 6 *Md.,* 50; *Gabay vs. Lloyd,* 3 *B. & Cr.,* 793. And in this case, we think, the evidence deducible from the correspondence that took place between the parties, their business relations, and general conduct and mode of dealing, was sufficient to warrant the jury in finding as matter of fact that the plaintiff was acquainted with the usage proved, and intended to contract with reference to it. Indeed, his own testimony leaves but little room for doubt on the subject.

As to whether the usage is reasonable, we see no good ground to question that. It has had its origin and growth in the business transactions of the trade to which both the parties to this cause belong. The plaintiff himself has been compelled to resort to it to explain and give meaning to the contract he seeks to enforce; and it would not be just that he should be allowed to avail himself of such parts of it as may suit his purpose, and reject such other parts of it as may be unfavorable to him, upon the ground of its being unreasonable. If the contract was made with reference to it, it should be either adopted as a whole or rejected as a whole. But we see nothing in the usage itself, as proved, to require that it should be rejected either in whole or in part.

Where the gold was deliverable, that, we think, is settled by the contract of the parties. Ordinarily, where there is no place designated by the contract, the articles sold are to be delivered at the place where they are at the time of sale. The rule upon the subject, however, is greatly dependent upon the nature of the article sold, and the circumstances of the parties. But here, from the nature of the contract, it is plain that it never was intended that the seller should actually deliver the gold at Hagerstown. He tells us himself that such was not the intention of the contract. He says in his testimony, that when he sold the gold short to the defendants, it was not intended that he should deliver it and receive the price, but that the contract was to be closed and delivery effected by his order to the defendants to buy in the gold for his account. That they were to buy it, and pay or receive the difference between the buying and selling prices, and that the performance of the contract could be demanded at the option of either party. And it was in accordance with this understanding that he ordered the purchase of the gold on the 4th of October, and afterwards made tender of it to the defendants in Baltimore, instead of notifying them of his readiness to deliver at Hagerstown.

Whether the defendants could purchase in the gold upon default of margin, without giving notice to the plaintiff of their intention to do so, depended, of course, upon the contract, as interpreted by the usage. But that question is not presented on this appeal. The jury, under the instruction of the Court, having found a verdict for the plaintiff, they, of necessity, found as a matter of fact that the purchase of the gold on the 24th of September, by the defendants, was not authorized or justified in respect of any default of margin; and they found, as they were warranted in doing, under the second instruction on the part of the defendants, that the breach of the contract occurred by the defendants' refusal to purchase in the gold in accordance with the plaintiff's instruction to them of the 4th of October. Upon no other principle or theory could the verdict have been found, such as was found, under the instructions of the Court.

We think the Superior Court was right in overruling the plaintiff's objection to the admissibility of the evidence taken under the commission to New York. It was both competent and pertinent in one aspect in which the case was presented, though quite immaterial in the other.

It follows, of course, from what we have said, that the Superior Court was right in its ruling as to the admissibility of the evidence of usage; and that it was also right in refusing to grant the first of the plaintiff's prayers, as that prayer sought to ignore and exclude from consideration all question of usage, so far as the same might affect the contract adversely to the plaintiff.

The Court was equally right in refusing to grant the plaintiff's second prayer, as by that all question of the usage prevailing in Baltimore, if not also existing in Hagerstown, was excluded, notwithstanding the parties might have contracted with especial reference to the local usage of Baltimore.

The plaintiff's third prayer was also properly refused, first, because it left to the jury to find what usage would be binding on the plaintiff; that being a question of law for the

Court upon the usage found to exist as a fact; and, secondly, because it asserted that there was no evidence of a demand of margin. There was evidence of demand; though the effect of that demand depended upon other facts to be found by the jury.

The fourth prayer of the plaintiff was equally erroneous as those preceding it, and was therefore properly refused. It was based upon the theory that the gold was deliverable at Hagerstown, and not in Baltimore, and that before the plaintiff could be in default in regard to the margin to be placed in the hands of the defendants, demand should have been made for the performance of the contract at the former place; and that no usage in Baltimore could affect the performance of the contract. This, as we have said, was not in accordance with the intention of the parties.

As the fifth prayer of the plaintiff was originally presented, it was clearly erroneous, but as modified by the Court, when read in connection with the instructions granted on the part of the defendants, it was free from objection, and the Court was right in granting it in its modified form. The amount of margin, we think, was to be fixed and regulated by the price of gold in Baltimore, and not the prices that prevailed in New York, if there was in fact a real difference in the prices of the article at the two places. The contract makes no reference to the New York market as the criterion, nor do we perceive any reason why that market should be preferred to the one equally open and accessible to the parties in Baltimore. In the absence of some stipulation to the contrary, it should be presumed that the market price in the place where the contract was to be performed was intended.

As to the plaintiff's sixth prayer, the Court was right in rejecting that also. If the defendants were justified in purchasing the gold on the 24th of September, the plaintiff could have no right to complain that the defendants did not actually receive it until the 2d of October, as the delay was at their risk, and not that of the plaintiff; he was discharged from

the time of the purchase, and that without reference to any advance that might have occurred in the price of gold. On the other hand, if the defendants were not justified in making the purchase at the time they did, as the jury have found they were not, the plaintiff could have no interest in the purchase whatever, as no right of his could be compromitted by it.

Having thus disposed of the plaintiff's prayers, we deem it sufficient to say that we find no error in those granted on the part of the defendants. They fully and correctly instructed the jury upon the whole case before them; and we think that in the fifth prayer of the plaintiff as modified, and the second prayer of the defendants, the plaintiff's rights were as fairly placed before the jury as he could have reasonably required.

Upon review of the whole case we are of opinion that the judgment appealed from should be affirmed on both appeals.

*Judgment affirmed.*

(Decided 22d June, 1871.)