61 F.3d 900
 36 U.S.P.Q.2d 1395
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
HIRSCH-CHEMIE LIMITED, Plaintiff-Appellant,
and
HIRSCH-SCIONICS LIMITED; Hirsch Cinemedic Corporation, Plaintiffs,
v.
THE JOHNS HOPKINS UNIVERSITY, Defendant-Appellee.
 No. 94-2010.
 United States Court of Appeals, Fourth Circuit.
 Argued March 9, 1995.
Decided July 20, 1995.
 
 ARGUED: Michael Robert Diamond, O'TOOLE, ROTHWELL, NASSAU & STEINBACH, Washington, D.C., for Appellants. Frederick G. Savage, THE JOHNS HOPKINS UNIVERSITY, Baltimore, Maryland, for Appellee. ON BRIEF: Jeffrey B. O'Toole, O'TOOLE, ROTHWELL, NASSAU & STEINBACH, Washington, D.C., for Appellants. Eileen S. Goldgeier, THE JOHNS HOPKINS UNIVERSITY, Baltimore, Maryland, for Appellee.
 Before HALL and NIEMEYER, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PHILLIPS, Senior Circuit Judge:
 
 
 1
 In this diversity case, Hirsch-Chemie Limited and its subsidiaries, Hirsch-Scionics Limited and Hirsch Cinemedic Corporation, (collectively, "Hirsch") appeal from orders granting summary judgment in favor of The Johns Hopkins University ("Johns Hopkins") on Hirsch's two breach of contract claims and on one of Johns Hopkins's two counterclaims, and granting prejudgment interest to Johns Hopkins on its second counterclaim after a bench trial. With one modification respecting the rate of prejudgment interest to be recovered on the second counterclaim, we affirm.
 
 
 2
 * Hirsch-Chemie Limited and its subsidiaries are all Virginia corporations engaged in biotechnology-related businesses. Johns Hopkins is a major research university in the state of Maryland. In 1983, Hirsch and Johns Hopkins entered into two contracts. Under the first, the Joint Development Agreement ("J.D.A."), Hirsch provided Johns Hopkins with approximately one million dollars in cash and equipment to further certain cancer research. In return for its investment, Hirsch obtained a "first option to acquire a worldwide royalty-bearing license ... to make, have made, use and sell" products and inventions developed through the research. J.D.A. 4.2. By its terms, the J.D.A. was to expire three years from its effective date (July 27, 1983) "un less sooner terminated or extended by mutual consent" or unless a license was granted, in which case the J.D.A. would continue in effect for the duration of the license. Id. 6.4. Any license granted was to be in effect for at least eleven years. Id. 4.7. The J.D.A. could also be terminated by either party for a material breach of its terms by the other. Id. 6.5.
 
 
 3
 Johns Hopkins developed a product from the research and, in conformity with its contract obligations, notified Hirsch by letter dated October 30, 1985. Hirsch responded by letter dated November 22, 1985, that it wished to exercise its option and enter a licensing agreement. The parties dispute whether a license was ever created. On January 14, 1987, approximately three years and five months after the effective date of the J.D.A. (five months after the natural expiration date of the J.D.A.), Johns Hopkins notified Hirsch that it believed Hirsch had breached the J.D.A. by failing to submit production and sales goals necessary for the granting of a license agreement for that product. On April 16, 1987, after giving Hirsch time to cure its default, Johns Hopkins purported to terminate the J.D.A. and subsequently entered non-exclusive license agreements with at least three other licensees.
 
 
 4
 The second agreement between the parties, the License Agreement ("L.A."), gave Hirsch the exclusive right to develop and market products based upon a certain invention that Johns Hopkins had patented. Within thirty days of the effective date of the L.A. (August 18, 1983), Johns Hopkins was to turn over to Hirsch "all technical information and know-how" related to the invention that it had in its possession, "including prototypes." L.A. 4.3. In return, Hirsch was to advance to Johns Hopkins approximately thirty thousand dollars. Hirsch also obligated itself to pay royalties to Johns Hopkins upon commercial sales of any products that it developed from the information given to it by Johns Hopkins and subsequently licensed and marketed. L.A. 1.2, 3.2. If no commercial sales took place within three years of the effective date of the L.A., Hirsch agreed to pay minimum annual royalties from the end of the third year. Id. 3.2, 3.3. Each royalty payment was due within thirty days after the end of the royalty year. Id. 3.2.
 
 
 5
 Hirsch never licensed any products based on the invention or made any commercial sales covered by the L.A. On September 18, 1986, the first minimum royalty payment of fifteen thousand dollars became due; Hirsch made the payment on June 24, 1987. On September 18, 1987, the second royalty payment of thirty thousand dollars became due, but Hirsch never paid it. On November 4, 1987, Johns Hopkins terminated the L.A. on the ground that Hirsch had failed to make the required royalty payment after giving Hirsch notice and time to cure its default pursuant as required by the J.D.A. Id. 5.3 and 5.4.
 
 
 6
 On April 12, 1990, Hirsch sued Johns Hopkins for breach of contract based on the allegedly wrongful termination of the two agreements. Johns Hopkins filed two counterclaims against Hirsch, one for the second royalty payment due under the L.A. and one for breach of contract based on failure to pay maintenance costs of certain items of loaned equipment pursuant to an oral agreement between the parties.
 
 
 7
 Johns Hopkins moved for summary judgment on Hirsch's claims. The district court granted Johns Hopkins's motion, holding that Johns Hopkins was justified in terminating both contracts. As to the J.D.A., it held that summary judgment in favor of Johns Hopkins was appropriate because "Johns Hopkins terminated the J.D.A. according to its terms" and therefore had not breached the contract. J.A. 213. It held that "the three year natural life of the [J.D.A.] had passed" and that, even if the parties had mutually agreed to extend the J.D.A. (which it doubted), Hirsch had breached the J.D.A. by failing to provide an essential term of the license, the "production and sales goals" for the marketing of the invention, and thus Johns Hopkins had properly terminated the J.D.A. for Hirsch's breach. Id. at 213-14.
 
 
 8
 The district court also held that Johns Hopkins terminated the L.A. according to its terms. It explained that it was Hirsch's responsibility to obtain any necessary government approval for sales, that Hirsch neither sought nor obtained government approval nor made any sales, that Hirsch owed but failed to pay the second minimum royalty payment, and that Johns Hopkins was therefore justified in terminating the agreement due to Hirsch's breach. Id. at 214-15. The district court rejected Hirsch's argument that it was excused from its obligation to seek government approval because Johns Hopkins did not provide it with a prototype of the invention. Id. at 216. The district court concluded that Johns Hopkins had not breached the L.A. while Hirsch had, and that, as a matter of law, Johns Hopkins was therefore justified in terminating the L.A.
 
 
 9
 Johns Hopkins then moved for partial summary judgment on its counterclaim for the unpaid royalty installment and Hirsch moved for partial summary judgment on the counterclaim for maintenance costs. The district court granted Johns Hopkins's motion, awarding it $30,000, but denied Hirsch's motion on the ground that there were genuine issues of material fact regarding the alleged oral agreement for Hirsch to maintain the equipment. After a bench trial on the counterclaim for maintenance costs, a magistrate judge entered judgment in favor of Johns Hopkins, awarding it $16,704 plus prejudgment interest.
 
 
 10
 Hirsch now appeals from the summary judgments in Johns Hopkins's favor and from the magistrate judge's award of prejudgment interest on the maintenance costs counterclaim.
 
 II
 
 11
 We review grants of summary judgment de novo, applying the same standards as applied by the district court. Felty v. GravesHumphreys Co., 818 F.2d 1126, 1127-28 (4th Cir.1987). "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990) (citing Fed.R.Civ.P. 56(c)), cert. denied, 498 U.S. 1109 (1991). The burden of establishing the nonexistence of a "genuine" issue is on the moving party, and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The non-moving party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, [and] the most favorable of possible alternative inferences from it drawn in his behalf." Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979). However, a bare allegation or a mere scintilla of evidence is not sufficient to create an issue of fact. Anderson, 477 U.S. at 252.
 
 III
 
 12
 Hirsch argues first that its claim regarding Johns Hopkins's breach of the J.D.A. should not have been disposed of by summary judgment because genuine issues existed as to at least three material facts, namely: (1) whether and when a license was created; (2) whether and how long the parties extended the J.D.A.; and (3) whether Hirsch failed to use "best efforts" to market the allegedly licensed product. We disagree and therefore affirm the district court's grant of summary judgment.
 
 
 13
 Maryland contract law governs the construction of the J.D.A. J.D.A. 8.9. Under Maryland law, as generally, where the language of a contract "is clear and unambiguous, the construction of the contract is a matter of law for the court," Della Ratta, Inc. v. American Better Community Developers, Inc., 380 A.2d 627, 633-34 (Md.Ct.Spec.App.1977), "and it must be presumed that the parties meant what they expressed," Orkin v. Jacobson, 332 A.2d 901, 904 (Md.1975). Moreover, "[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." Slice v. Carozza Properties, Inc., 137 A.2d 687, 693 (Md.1958).
 
 
 14
 The terms governing the duration of the J.D.A. are clear and unambiguous. The J.D.A. was to expire on July 26, 1986, so long as it was not extended by one of several means. It could have been extended by mutual consent of the parties. J.D.A. 6.4. If a license were created, the J.D.A. would have been extended for the duration of the license. Id. In addition, once Johns Hopkins developed a product that could be licensed, Hirsch had 180 days to exercise its option to obtain an exclusive license, Id. 4.2; if Johns Hopkins notified Hirsch that it had developed a product within 180 days of the expiration of the J.D.A., the J.D.A. would have been extended as necessary to allow Hirsch its allotted 180 days to exercise its option to obtain a license, the creation of which would have itself extended the J.D.A. even longer.
 
 
 15
 None of these eventualities occurred, and the J.D.A. consequently expired on July 26, 1986, three years after its execution. Johns Hop kins notified Hirsch Chemie that it had developed a product for which it had the option to obtain an exclusive license on October 30, 1985, more than 180 days before the natural expiration date of the J.D.A., July 26, 1986. Therefore, the 180-day option period did not extend the J.D.A.
 
 
 16
 Neither was the J.D.A. extended by the creation of a license. Hirsch argues that the J.D.A. itself created a license or, in the alternative, that a license was created by an exchange of letters between agents of the two parties. We disagree. The J.D.A. did not contain all the essential terms of a license, but instead contemplated the creation of future licenses. Paragraph 8.4 states that the J.D.A. "shall not be construed to grant any license from ... Johns Hopkins to Hirsch except as expressly provided herein." Paragraph 4.2 expressly provides that Johns Hopkins grants Hirsch an option to acquire licenses as opposed to actually granting a license itself. Other paragraphs refer to licenses to be granted in the future and terms to be specified later. E.g., J.D.A. 4.7, 6.3, 6.4. We therefore conclude that, by its unambiguous terms, the J.D.A. did not convey a license to Hirsch, but merely granted it the first right to negotiate for an exclusive license on all products developed by Johns Hopkins during certain research.
 
 
 17
 The parties did negotiate and attempt to create a license agreement but were unsuccessful in that endeavor. An agent of Johns Hopkins wrote to Hirsch on October 30, 1985, notifying Hirsch that it had developed a product for licensing and that, if Hirsch wished to exercise its option to acquire a license, it should respond in writing and then Johns Hopkins would draft a proposed license agreement. J.A. 41. Hirsch agents responded twice, once by letter dated November 22, 1985, and once by letter dated February 25, 1986, stating that Hirsch did indeed desire to exercise its option. J.A. 42, 165. These letters referred to the draft license agreement, noting that its consummation would be "subject to approval by all parties involved." J.A. 42. An agent of Johns Hopkins wrote another letter on September 5, 1986, in which it assigned a license number to the item in question and discussed the matter of Hirsch's paying the costs of patenting the invention. J.A. 190. Hirsch argues that the initial exchange of letters constitutes a binding offer and acceptance of a license. Hirsch also contends that the September letter, and Hirsch's subsequent payment of the patenting costs, is proof that a license existed, noting specifi cally that Hirsch was obliged to pay patent costs only for licensed products according to J.D.A. 4.5. Hirsch contends that the written license agreement anticipated by the parties would only have memorialized their already-existent contract and would have been a mere formality.
 
 
 18
 We disagree with these contentions. The parties were simply in the process of negotiating the terms of a license agreement. They clearly anticipated consummating the license only after the material terms, as formulated in a draft written license agreement, were agreed upon. No such agreement ever materialized, apparently due largely to the inability of the parties to agree upon one material term of the license, production and sales goals for marketing the invention.[1] The September 5, 1986, letter itself noted that the same term was still unsettled, leaving the license agreement incomplete; this statement negates any inference to be drawn from that letter that the granting of a license number and payment of patent fees were anything more than good faith gestures along the way to the ultimate agreement. J.A. 190. Apparently, the parties never finalized a written license agreement despite repeated requests by Johns Hopkins for Hirsch to provide production and sales goals for approval and despite Hirsch's implicit acknowledgment that producing proposed goals was its responsibility by asking for more time to produce them. J.A. 104, 106, 191.
 
 
 19
 The controlling principle of contract formation here is that expressed in the Restatement (Second) of Contracts Sec. 27 (1979):
 
 
 20
 Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.
 
 
 21
 (emphasis added). The undisputed circumstances here establish as a matter of law that the parties were merely engaging in preliminary negotiations and meant to form a binding license agreement only with the execution of a written license agreement. We therefore conclude that the parties never extended the J.D.A. by creating a license.
 
 
 22
 Finally, the J.D.A. was not extended by the mutual consent of the parties to or beyond April 16, 1987, the date upon which Johns Hopkins purported to terminate the J.D.A, and therefore its three year term expired on July 26, 1986. The J.D.A. never was extended in writing, as is required by J.D.A. 8.10, which states that "no modification or amendment to this Agreement shall be effective unless agreed to in writing, executed by both parties." The record indicates that there may have been an oral agreement to extend the J.D.A., but only for one month, at Hirsch's request, for the limited purpose of allowing Hirsch more time to develop a production and sales plan. J.A. 101-02, 104. This one-month extension also expired without finalization of a license agreement. Id.
 
 
 23
 Hirsch argues that the behavior of the parties implies that they mutually agreed to an extension of the J.D.A., noting that Johns Hopkins did not try to terminate the J.D.A. on July 26, 1986, that the parties continued to negotiate towards a license agreement for several months after the natural expiration date of the J.D.A., and that Johns Hopkins eventually wrote two letters in which it purported to terminate the J.D.A. on April 16, 1987, implying that it believed the J.D.A. was still in force at that time. J.A. 104-06. We disagree that such an inference properly could be drawn from the parties' behavior.
 
 
 24
 At most, such activity may be evidence of a subsequent oral agreement with the same terms as the original agreement. The controlling principle here is that expressed, for example, in 17A C.J.S. Contracts Sec. 449, at 561 (1963): "the fact that the parties by their acts and declarations indicate an intention to treat a written contract as continuing after the time prescribed in it for its termination will not have the effect of continuing such contract, although it may show a subsequent oral agreement on the same terms." Hirsch did not argue or offer proof that the parties made a subsequent express oral agreement on the same terms as the J.D.A. Therefore, because the unambiguous terms of the J.D.A. mandate that it expired on July 26, 1986, or August 26, 1986, at the latest, without any provision for its automatic extension, any activity by the parties indicating that they believed the J.D.A. to continue in effect after that time was ineffective to extend the J.D.A.
 
 
 25
 Moreover, even if the parties had somehow extended the J.D.A. by implicit mutual consent, the claim was properly dismissed via summary judgment. Paragraph 6.1 provides that Hirsch" will devote its best efforts to establishing and expanding a market for the various [licensed] products manufactured pursuant hereto." Hirsch argues that the "best efforts" requirement applies only to actual marketing efforts and not to the requirement in paragraph 6.3 that it "specify production and sales goals." In addition, it contends that it did make significant efforts to market the invention and that there is a genuine issue as to whether those efforts met the best efforts requirement. However, Hirsch could not very well establish and expand a market for Johns Hopkins's invention without setting production and sales goals, gaining Johns Hopkins's approval of those goals, and obtaining a license to make and sell the products. Having failed to take those steps, it therefore failed to use its best efforts to market the invention and Johns Hopkins would have been justified in terminating the J.D.A. for cause had it not already expired. See J.D.A. 6.3 ("[F]uture license agreements for licensed products will specify production and sales goals to be mutually agreed upon and ... failure of Hirsch and its licensees to meet these goals could result in termination of the license or conversion to nonexclusive."); 6.5 ("Either party may terminate this Agreement if the other party shall breach any material provision of this Agreement and such breach shall continue unremedied for a period of ninety (90) days after written notice of such breach is sent to the breaching party.").
 
 
 26
 In sum, we hold that there is no genuine issue of material fact warranting a trial regarding Hirsch's claim that Johns Hopkins breached the J.D.A. The J.D.A. expired on July 26, 1986, or on August 26, 1986, at the latest, and Johns Hopkins could not therefore have breached it at a later date. Additionally, even if the J.D.A. was extended by implicit mutual consent, Johns Hopkins was justified in terminating it for cause on grounds of Hirsch's material breach and did so according to its terms by giving Hirsch the required notice and opportunity to cure its default.
 
 IV
 
 27
 We likewise conclude that the district court properly granted summary judgment dismissing Hirsch's claim that Johns Hopkins breached the L.A. and granting Johns Hopkins's motion for summary judgment on its counterclaim for royalties due under the L.A. Hirsch argues that genuine issues existed as to several material facts, including (1) when royalties became due, if ever; (2) whose responsibility it was to obtain government approval of products to be sold; and (3) whether Hirsch's failure to obtain government approval was excused by Johns Hopkins's failure to develop its invention to the point of commercial marketability or by Johns Hopkins's failure to give Hirsch a prototype of its invention. We disagree, and therefore affirm the district court's grants of summary judgment of both the claim and the counterclaim.
 
 
 28
 Maryland contract law also governs the construction of the L.A. L.A. 6.3. The L.A. provided that, if no commercial sales of the invention occurred within the first three years after the effective date of the L.A., minimum royalty payments would become due beginning at the end of the third year. L.A. 3.2, 3.3. Delay of payment would only be excused if the first sale was postponed "by reason of a delay in receiving the required governmental approval for such sale." Id. 3.3. If Hirsch failed to pay the minimum royalties when due, Johns Hopkins had the option of terminating the contract. L.A. 5.4. Hirsch contends that, because no government approval was ever obtained, no royalty payment was ever due, and that, because no royalty was due, Johns Hopkins breached the L.A. by purporting to terminate it without justification. Hirsch also maintains that it was not responsible for seeking and obtaining government approval and, in the alternative, was prevented from obtaining government approval by Johns Hopkins's failure to provide a prototype of the invention and a commercially marketable product that could be approved, or that there is at least a genuine issue as to these facts.
 
 
 29
 We disagree. First, we agree with the district court that under the L.A.'s provisions, Hirsch was responsible, as a matter of law, for obtaining government approval. Although the L.A. does not explicitly state this, the contract as a whole plainly so contemplates. In the agreement's preamble, Hirsch declares that it "wishes to obtain rights to the above-noted invention, and technical information and knowhow in support of its development and sales efforts in this area." Paragraph 2.1 then provides that Hirsch receives "the rights to make, have made, use, have used, sell, and have sold the Licensed Products" developed from Johns Hopkins's invention. These provisions and others clarify that Hirsch is responsible for developing, making, marketing and selling licensed products based upon the invention. Included in these obligations would naturally fall the obligation to seek necessary government approval for any sale of any product developed by Hirsch. Hirsch never proffered any evidence to contradict the plain implication of these provisions save for an affidavit of one of its officers stating that Hirsch subjectively believed the responsibility to be Johns Hopkins's. J.A. 193. That of course could not suffice to put the intended meaning of this matter in issue.
 
 
 30
 Neither did Hirsch sufficiently counter Johns Hopkins's plain showing that the custom in the industry is for the licensee, not the licensor, to obtain government approval for sales. See J.A. 136, 143. Relying on the rule that "a usage, to be admissible, must be proved to be known to the parties, and to be so general and well established that knowledge and adoption of it may be presumed," Jarrett v. J. Staum & Sons Co., 113 A. 720, 721 (Md.1921), Hirsch proffered that it had no actual knowledge, but "knowledge of a trade usage will be imputed to persons in the same trade." Wathen v. Pearce, 3 A.2d 486, 492 (Md.1939). And, where a usage exists in reference to a particular trade or business, the contracts of parties engaged in that business "must be presumed to be cognizant of the usage," unless it is expressly excluded. Appleman v. Fisher, 34 Md. 540, 554-55 (1871). Here, it is indisputable on the summary judgment record that Hirsch is a biotechnology company, J.A. 63, engaged in the business of marketing medical technology, contracting for a license to market an invention under the L.A., and attempting to contract for a license to market a product under the J.D.A. There is no suggestion that the parties expressly excluded this trade usage from implicit inclusion in the L.A. Construing the instrument as a whole and in light of this trade usage, we therefore conclude that there is no genuine issue of material fact on this point and that as a matter of law Hirsch, as licensee under the L.A., bore the responsibility for obtaining government approval for any products it developed from Johns Hopkins's invention.
 
 
 31
 Second, we agree with the district court that Hirsch was not prevented from obtaining government approval by Johns Hopkins's failure to provide a prototype of its invention. Paragraph 4.3 of the L.A. provides:
 
 
 32
 4.3 Within thirty (30) days after execution of this Agreement, [Johns Hopkins] shall furnish to [Hirsch] ... all technical information and know-how, including prototypes, which it has in its possession and which relate to the [invention].
 
 
 33
 (emphasis added). The district court held that Johns Hopkins had complied with this paragraph by turning over any information in its possession. It also held that Johns Hopkins did not have to turn over a prototype because it had none in its possession except a very primitive device unusable to Hirsch and because paragraph 4.3 did not require it to create one. We agree. Johns Hopkins offered proof that (1) the only existing prototype was primitive and unusable to Hirsch; (2) it could only be operated in a hospital with the special power lines and x-ray shields available there, so Hirsch always brought interested buyers to the hospital for demonstrations; (3) the invention's inventor was the only person able to operate the primitive prototype; (4) an agent of Hirsch admitted that no prototype existed at the time the L.A. was signed; and (5) an agent of Hirsch admitted in a 1987 meeting that the inventor had done everything and delivered everything requested by Hirsch. J.A. 139, 142. Hirsch never offered evidence to contradict Johns Hopkins's offered proof. We therefore conclude that Hirsch has failed to make a showing sufficient to raise a genuine issue as to whether Johns Hopkins was obliged to supply a prototype of its invention and whether Hirsch can be excused from seeking government approval by any failure to do so.
 
 
 34
 Third, Hirsch was not prevented from obtaining government approval by Johns Hopkins's failure to provide a commercially marketable product. Hirsch did not bargain for a commercially marketable product. In the preamble to the L.A., Johns Hopkins merely warranted that it was "the owner of an invention relating to on-line treatment monitoring for radiation teletherapy" and made no representations regarding its stage of development. All Hirsch contracted for under the clear terms of the contract was a license for the invention as it existed as of August 1983; no provision of the L.A. required Johns Hopkins to improve or further develop the invention. Moreover, several provisions state that Hirsch itself would develop the invention into marketable products. L.A. preamble, 2.1. Hirsch proffered some evidence of its subjective expectation that Johns Hopkins's invention would be commercially marketable without further development by Hirsch, but it is irrelevant. Faulkner v. American Casualty Co., 584 A.2d 734, 739 (Md.Ct.Spec.App.) ("While the subjective intent of the parties at the time the agreement was executed may be the subject of a dispute, that dispute does not concern any material fact.... Further, where the language of an agreement is unambiguous, the subjective intentions of the parties become irrelevant."), cert. denied, 590 A.2d 158 (Md.1991).
 
 
 35
 Because the terms of the L.A. clearly did not require Johns Hopkins to provide a commercially marketable invention, no genuine issue exists as to whether Hirsch is excused from its obligation to obtain government approval by the non-marketability of Johns Hopkins's invention.
 
 
 36
 Finally, there is no genuine issue regarding when, if ever, the royalties became due. Hirsch argues that, because government approval was not, and could not be, obtained, no royalties ever became due.[2] However, because Hirsch never sought or obtained government approval, there was no delay in receiving government approval that could operate to delay the due date of the first royalty payment under paragraph 3.3. There is therefore no doubt that the first royalty payment of $15,000 became due on September 18, 1986, and the second royalty payment of $30,000 became due on September 18, 1987. L.A. 3.2, 3.3. Hirsch paid the first, albeit late, but did not pay the second.
 
 
 37
 Johns Hopkins's right to terminate the contract for nonpayment of royalties is governed by L.A. 5.3 and 5.4. These paragraphs provide:
 
 
 38
 5.3 Upon breach or default of any of the terms and conditions of this Agreement, the defaulting party shall be given notice of such default in writing and a period of thirty (30) days after receipt of such notice to correct the breach or default.
 
 
 39
 5.4 In the event that the minimum annual royalties required under Section 3.2 hereinabove are not paid,[Johns Hopkins] may, at its option, terminate this Agreement or convert the exclusive license granted under Section 2.1 hereinabove to a non-exclusive license.
 
 
 40
 Because Hirsch withheld the second royalty payment without justification, Johns Hopkins properly terminated the L.A. Because Johns Hopkins gave Hirsch the required 30 days notice and otherwise complied with the requirements of the L.A., it did not breach the L.A. In contrast, Hirsch did breach the L.A. by withholding the second royalty payment.
 
 
 41
 We therefore affirm the district court's grant of summary judgment in favor of Johns Hopkins both on Hirsch's breach of contract claim and Johns Hopkins's counterclaim for the unpaid royalty.
 
 V
 
 42
 Finally, we address Hirsch's challenge to the award of prejudgment interest on the award for Johns Hopkins's second counterclaim. Although prejudgment interest was not discussed at trial, Johns Hopkins requested it during the preparation of the order awarding it maintenance costs for various items of equipment, and the magistrate judge awarded it without explanation. J.A. 243-44. Under Maryland law, a trial judge may, within its discretion "award prejudgment interest to place the injured party in a breach of contract case in the same position [it] would have occupied had the defendant not broken its promise." Knowles v. Mutual Life Ins. Co. of New York, 788 F.2d 1038, 1041 (4th Cir.), cert. denied, 479 U.S. 948 (1986). See also Bituminous Constr., Inc. v. Rucker Enters., Inc., 816 F.2d 965, 969 (4th Cir.1987); Crystal v. West & Callahan, Inc., 614 A.2d 560, 572 (Md.1992).
 
 
 43
 We conclude that the award of prejudgment interest in this case was a proper exercise of discretion.[3] The amount due was a "fixed and definite sum." See Bituminous Constr., Inc., 816 F.2d at 969. Johns Hopkins notified Hirsch of the amount owed in writing on November 19, 1984, and again on February 19, 1985, using such phrases as "as per our verbal agreement." J.A. 286-87, 296. Hirsch apparently promised to reimburse the amount as of January 1985. Hirsch's nonpayment of that sum denied Johns Hopkins its use for more than nine years. Therefore, it was proper for the magistrate judge to award prejudgment interest from January 1, 1985, to the date of the order, June 3, 1994.
 
 
 44
 Hirsch objects to the award of prejudgment interest on the grounds that, "[w]hile the amount allegedly due under the alleged oral agreement was ascertainable prior to the Court's judgment, whether it was actually owed was not determined until the decision of the Court." Appellants' Br., 27. Hirsch also argues that the magistrate judge abused her discretion by awarding prejudgment interest in her order without stating the reason. Hirsch's arguments are unavailing. The fact that one contracting party disputes either the existence of a contract or the amount due under it does not render the award of prejudgment interest in the discretion of the trial judge inappropriate. If prejudgment interest were held inappropriate in any case in which the defendant disputed his obligation to pay an amount under an alleged contract, the exception would subsume the rule.
 
 
 45
 Lastly, we conclude, however, that the magistrate judge erred in ordering that the prejudgment interest be calculated at the postjudgment rate of ten percent per annum. Crystal, 614 A.2d at 572. It should be awarded at the general legal rate applied in the absence of statute (six percent per annum). Id. (citing Md. Const. art. III, Sec. 57). We note, however, that the amount of prejudgment interest so calculated becomes part of the judgment upon which post-judgment interest is now allowable at ten percent per annum. I.W. Berman Properties v. Porter Bros., Inc., 344 A.2d 65, 79 (Md.1975); Md.Code Ann. [Cts. & Jud. Proc.] Sec. 11-107(a) (1995). The judgment in favor of Johns Hopkins on its counterclaim for maintenance costs should, therefore, be modified accordingly.
 
 AFFIRMED, AS MODIFIED
 
 
 [1]
 J.D.A. 6.3 provides that "future license agreements for licensed products will specify production and sales goals to be mutually agreed upon."
 
 
 [2]
 Johns Hopkins argues that Hirsch raises this argument for the first time on appeal and that this Court should therefore not address the issue. It is true that Hirsch did not raise the issue in its memorandum opposing summary judgment on Johns Hopkins's counterclaim. J.A. 230-32. However, Hirsch did raise this precise argument in its memorandum opposing Johns Hopkins's motion for summary judgment on Hirsch's claims, J.A. 181-183, and we therefore will address the issue on appeal
 
 
 [3]
 "[P]rejudgment interest is not allowed on unliquidated claims.... [I]f the contract requires payment of a sum certain on a date certain, ... prejudgment interest typically is allowed as a matter of right." Crystal, 614 A.2d at 572. The award of prejudgment interest is a matter for the discretion of the finder of fact for contracts that fall somewhere in between these two extremes. Id., at 573. Because we find that the award in this case was an appropriate exercise of discretion, we do not reach the issue whether prejudgment interest was also allowable as a matter of right